IN THE CASE OF


UNITED STATES, Appellee

v.

Rico S. GORE, Equipment Operator Constructionman
U.S. Navy, Appellant

No. 03-6003

Crim. App. No. 200300348

_____

United States Court of Appeals for the Armed Forces

Argued December 9, 2003

Decided August 18, 2004

GIERKE, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., EFFRON, BAKER, and ERDMANN, JJ., joined.

Counsel

For Appellant:  Lieutenant Colin A. Kisor, JAGC, USNR (argued);
Lieutenant Marcus N. Fulton, JAGC, USN (on brief).

For Appellee:  Major Raymond E. Beal, II, USMC (argued);
Commander R. P. Taishoff, JAGC, USN (on brief); Lieutenant Frank
L. Gatto, JAGC, USN.

Military Judge:  John A. Maksym


**This opinion is subject to editorial correction before final publication**.

Judge GIERKE delivered the opinion of the Court.

Article 37(a) Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 837(a) (2000), prohibits unlawful command influence by all persons subject to the UCMJ. Unlawful command influence is recognized as "the mortal enemy of military justice." United States v. Thomas, 22 M.J. 388, 393 (C.M.A. 1986). This case concerns unlawful command influence by a commanding officer who ordered a senior enlisted Chief petty officer not to testify in support of Appellant and may have deterred others at the command from testifying on behalf of Appellant. As a remedy for the unlawful command influence, the military judge ordered the charges dismissed with prejudice. The Government filed an interlocutory appeal of the ruling of the military judge. The lower court also found unlawful command influence but disagreed with the military judge's remedy. We granted review of two issues but focus on whether the military judge abused his discretion in the remedy he imposed because of the unlawful command influence. In resolving this issue, we address the nature and effect of the unlawful command influence and the alternative remedies available to address it.

The granted issues are:

I.

WHETHER, HAVING FOUND UNLAWFUL COMMAND INFLUENCE, THE MILITARY JUDGE ABUSED HIS DISCRETION IN DISMISSING THE CASE WITH PREJUDICE.

II.

WHETHER THE LOWER COURT ERRED BY ENGAGING IN
IMPERMISSIBLE FACT-FINDING WHEN RULING ON THE
GOVERNMENT'S APPEAL PURSUANT TO ARTICLE 62, UCMJ, 10
U.S.C. § 862 (2000).

For the reasons set out below, we reverse the decision of the Court of Criminal Appeals (CCA).

## I. PROCEDURAL POSTURE OF THE CASE

Appellant, an Equipment Operator Constructionman, was assigned to U.S. Naval Mobile Construction Battalion ONE-THIRTY-THREE located at Gulfport, Mississippi. Appellant was charged with two specifications of desertion and one specification of unauthorized absence, in violation of Articles 85 and 86, UCMJ, 10 U.S.C. §§ 885 and 886 (2000), respectively. Appellant was placed in pretrial confinement on September 3, 2002, and charges were preferred and referred to a special court-martial on September 10, 2002.

On September 19, Appellant was arraigned, but the court recessed until November. Before the trial resumed, Appellant and the convening authority (CA) entered into a pretrial agreement. In preparation for the anticipated sentencing phase of the court-martial, trial defense counsel attempted to obtain character witnesses from Appellant's unit but was thwarted by unlawful command influence by the CA. On November 21 at an Article 39(a), UCMJ, 10 U.S.C. § 839(a)(2000) session, defense counsel moved for dismissal of the charges due to unlawful

3

command influence, and the military judge granted the motion to dismiss with prejudice.

Pursuant to Article 62, UCMJ, 10 U.S.C. § 862 (2000), the Government appealed to the CCA. Initially, the CCA remanded the case to the military judge with instructions to "prepare detailed and complete findings of fact and conclusions of law concerning his decision to dismiss this case with prejudice[.]" United States v. Gore, NMCM No. 200202409, slip op. at 2 (N-M. Ct. Crim. App. Jan. 15, 2003). The military judge complied with the CCA's order. The military judge's second findings of fact and his conclusions of law are restated in the lower court opinion. United States v. Gore, 58 M.J. 776, 778-84 (N-M. Ct. Crim. App. 2003).[*]

Upon further review, the CCA agreed with the military judge that there was unlawful command influence, but concluded that the military judge abused his discretion in fashioning a remedy. The lower court issued an opinion ordering that the case be remanded to the military judge to "select an appropriate remedy, short of dismissal of the charges." Id. at 788. This remand order was not executed as this Court granted Appellant's petition for grant of review under Article 67(a)(3), UCMJ, 10 U.S.C. § 867(a)(3)(2000).

---

[*] It should be noted that the events related to the unlawful command influence occurred in the month of November rather than September 2002.

Facts Relating to Unlawful Command Influence

The relevant events were presented through the testimony of the witnesses during the evidentiary hearing on the motion to dismiss. As previously noted, Appellant's unit was located at Gulfport, Mississippi. For reasons that are not stated in the record, the court-martial was convened at Naval Air Station, Pensacola, Florida. As the detailed defense counsel, Lieutenant Brian Maye, was stationed in Gulfport, he and any witnesses from Appellant's command were required to travel to Pensacola for the trial.

Anticipating Appellant's guilty plea pursuant to the signed pretrial agreement, defense counsel worked to prepare a sentencing case for Appellant. On November 18, three days before the trial was scheduled to resume, Lieutenant Maye went to Appellant's unit to obtain possible defense witnesses. Lieutenant Maye testified that he wanted to identify individuals who would fill out questionnaires detailing support of Appellant. Lieutenant Maye sought out Equipment Operator Chief E-7 (Chief) Metheny in particular, as Appellant "wanted Chief Metheny to assist in our defense."

Lieutenant Maye testified that he did not believe that he needed authority from the commanding officer to seek out defense witnesses from members of the command. He testified that his

going on base was "standard practice" and had "never been discouraged." Lieutenant Maye explained, "In Gulfport, the JAG attorneys . . . wear two hats. We are defense attorneys. Also we are legal assistance attorneys. So it's very common for us to go over to the spaces. We are frequently over to those spaces."

When Lieutenant Maye could not locate Chief Metheny, he left but returned the next day and made contact with him. Lieutenant Maye testified that they proceeded to Chief Metheny's office where defense counsel gave him six character witness questionnaires and Chief Metheny "immediately said, 'Well, I'll testify. Do you need me to testify? I'll testify.'" Accepting this offer, they discussed travel plans for the Chief to be a witness at the court-martial and the general substance of Chief Metheny's expected testimony on behalf of Appellant. Lieutenant Maye testified that Chief Metheny told him that "he thought [Appellant] was a really nice guy. And he said he thinks that [Appellant] should be retained."

Lieutenant Maye also testified that Chief Metheny agreed to distribute questionnaires to other senior enlisted personnel that he believed would also testify in support of Appellant. Chief Metheny stated that others in the command felt the same way about Appellant. Chief Metheny agreed with Lieutenant Maye that Chief Smith would say some positive things about Appellant.

Chief Metheny also specifically identified two other persons who would fill out questionnaires and also provide positive information. At the end of the conversation, Chief Metheny told defense counsel, "Come back tomorrow and I'll have the . . . character witness questionnaires for you." Lieutenant Maye testified that they concluded the conversation with Chief Metheny stating, "In the meantime, I'll go talk to my CO, my skipper." Immediately after this conversation Chief Metheny contacted and briefed his commanding officer, Commander Morton, about testifying.

On the afternoon of November 20, the day before trial, defense counsel returned to Appellant's command because he "was surprised that Chief Metheny hadn't contacted me, hadn't come over and dropped off the questionnaires." Lieutenant Maye testified that as he walked onto the command quarterdeck, Chief Metheny met him and informed him, "I can't help you, Lieutenant . . . I'm not testifying . . . . My skipper said no way. He said that I can't help Constructionman Gore." Also Chief Metheny refused to testify telephonically. When asked about the questionnaires, defense counsel testified that Chief Metheny said, "Lieutenant, my CO said we cannot help Constructionman Gore. End of story." As the two parted, Chief Metheny yelled out, "Hey Lieutenant, this is between me and you."

7

Lieutenant Maye left the command but shortly returned, accompanied by his officer-in-charge, Lieutenant Weber. Lieutenant Maye sought to arrange a second meeting with Chief Metheny and to have Chief Metheny repeat his statements in the presence of Lieutenant Weber. Defense counsel and Lieutenant Weber discussed with Chief Metheny his basis for refusing to testify. Chief Metheny stated that neither he, nor anyone else in his command, would testify on behalf of Appellant in light of the order by the commanding officer, Commander Morton. Chief Metheny "alluded to negative ramifications that would stem from testifying and terminated the meeting . . . ." He reinforced this point when he grabbed his collar device and stated that he attained his present grade of chief in 11 years when he was expected to make it in 16 years and that one gets ahead by not bucking the system. Lieutenant Maye's further contacts with Appellant's command resulted in his being informed that Chief Metheny would be in Pensacola the next day to testify. Although Lieutenant Maye thought the command may have resolved the problem and that Chief Metheny would testify favorably for the defense as he had initially indicated he would, Lieutenant Maye proceeded to prepare to raise the command influence issue at the court-martial.

Based on these developments, on the evening of November 20 trial defense counsel prepared a Motion to Dismiss due to

unlawful command influence and informed trial counsel of this issue. Having traveled to Pensacola the next morning, trial defense counsel and trial counsel informed the military judge of the potential command influence issue.

However, as Chief Metheny was also present in Pensacola and available as a witness, Lieutenant Maye met with him to discuss his testimony. Here again, Chief Metheny informed defense counsel that he could not help the defense. Defense counsel testified that Chief Metheny said, "Lieutenant, I'm here. The CO told me to be here, but I'm not going to be any help to you. The CO told me to to[e] the line and that's what I'm doing. I'm not testifying." Chief Metheny further stated that the accused was going to be released within 30 days and the accused was not worth risking his career. He conceded that the commanding officer did exert pressure over his prospective testimony. Lieutenant Maye also testified that Chief Metheny told him that "he had to recognize that the Commanding Officer authorized his fitness reports." Lieutenant Maye testified that Chief Metheny also said "Even if the CO is exposed, he's going to get a slap on the wrist. He's . . . either going to make Captain or he's a Captain-select. That's the way it works, Lieutenant." Finally, Lieutenant Maye testified that Chief Metheny stated that the commanding officer had called him on the telephone the night before trial and told him "You're going to Pensacola and

9

you know what the . . . command's position is on this matter." According to Lieutenant Maye, Chief Metheny said that if he did testify that he would "testify consistent with the command's wishes." Chief Metheny informed Lieutenant Maye that there would be repercussions if he testified in support of Appellant. Chief Metheny did not state that the commanding officer threatened that, rather, he indicated that he believed he "would never make Senior [Chief]" if he testified. Lieutenant Maye testified that in a final conversation, shortly before the court-martial began, Chief Metheny stated that he had "a family to protect . . .[and he is] going to say exactly what the command wants [him] to say."

In light of these statements by Chief Metheny, in the late morning of November 21, defense counsel filed the motion with the court-martial. In the afternoon of November 21, the court-martial reconvened to litigate the defense motion to dismiss on the basis of unlawful command influence.

Since original detailed defense counsel, Lieutenant Maye, was now a witness for Appellant, substitute defense counsel argued the motion at the special court-martial. Initially Lieutenant Maye provided all of the previously detailed testimony as to his prior contacts with Chief Metheny both at the command in Gulfport and the morning of trial in Pensacola.

10

Following the testimony of the original defense counsel, the defense called Chief Metheny as a witness. He testified that he had minimum contact with the Appellant who served in his platoon for less than two weeks prior to his alleged unauthorized absence. Chief Metheny disclosed that he also had been the command representative for a brig visit with Appellant earlier in November but otherwise denied personally knowing Appellant.

Immediately thereafter, Chief Metheny denied telling Lieutenant Maye that he would be willing to testify at the court-marital as a character witness on behalf of Appellant. He also denied volunteering to testify on behalf of Appellant. Chief Metheny stated his personal view that he had seen a lot worse stay in the Navy, but he reaffirmed that he had nothing positive to say as a professional opinion about Appellant. Chief Metheny did confirm that he agreed to distribute the defense questionnaires to others in the command who may be able to fill them out, but explained that he "hadn't gotten around to it . . . ." Chief Metheny could not recall Lieutenant Maye asking him about testifying electronically. Also, Chief Metheny denied discussing with Lieutenant Maye and Lieutenant Weber the prospect of appearing as a defense witness at the trial. He denied any knowledge even of being a witness, but explained his

11

presence at the court-martial as a possible command representative.

At this point, Chief Metheny testified as to his conversations with his commanding officer. He explained that when he met with him, the commanding officer told him that his presence was not required at the court-martial. Chief Metheny testified that the commanding officer viewed the trial as a "done deal" and that the result "was already predetermined." Chief Metheny denied that the commanding officer "had said that no one should help [Appellant]."

Chief Metheny also disclosed that he had a chance meeting with the commanding officer at the command the day before the trial, in which the commanding officer expressed concerns "about the inappropriateness of the Lieutenant [Maye] coming into the command and not checking in with the [executive officer]." The commanding officer stated that he wanted Chief Metheny to attend the court-martial.

Regarding his conversation with Lieutenant Maye the morning of trial, Chief Metheny made repeated denials that contradicted the testimony of Lieutenant Maye. Chief Metheny denied that he had said the commanding officer had told him to "to[e] the line" or that he had stated that if he testified for Appellant he would never make senior chief. He also denied telling Lieutenant Maye that the commanding officer had called him to

discuss the case. He denied telling Lieutenant Maye that he was going to say what the command wanted him to say. Finally, he denied that the commanding officer in any way tried to affect his testimony, told him not to testify on behalf of Appellant, or told him not to help Appellant.

Next, Lieutenant Weber testified as a defense witness. Lieutenant Weber testified that he sat in on the second meeting with Lieutenant Maye and Chief Metheny, and that they discussed whether Chief Metheny was going to be a witness for Appellant during sentencing. He corroborated the testimony of Lieutenant Maye. He testified that Chief Metheny expressed hesitation about testifying as a defense character witness for Appellant because of his concern about "his status in the command . . . [and] his promotion." He stated that "the CO told [Chief Metheny] that he [Chief Metheny] was not going to testify." Lieutenant Weber also testified that Chief Metheny stated that the commanding officer said that "nobody from the command was going to either testify or fill out any of the client witness questionnaires." Lieutenant Weber stated that his understanding of the conversation between Chief Metheny and his commanding officer was that Chief Metheny "said, 'Hey I'm going to testify. I'm going to be in Pensacola. Anything you need me to do?' And my understanding is that the CO said, 'You're not going.' And

13

the Chief's response was, 'Roger that.' And that was the end of the conversation."

Lieutenant Weber stated that he was "in shock basically as to what was going on." Lieutenant Weber testified, "And I said, 'Chief, are you serious? Is this going to have a consequence on your - your promotion?' And his response to me was, 'How long have you been in the Navy?'" Lieutenant Weber explained that Chief Metheny "also showed me his collar device and said, 'I received this in 11 years. It takes usually people in my rate 16 years. I got this by sitting back and watching how things work.' And he said that he's seen a lot of people try to do the right thing and get burned by it."

After the testimony of these three witnesses, the defense rested. The military judge at this point stated, "As a matter of law, the court finds that the defense has more, by a rather exceeding level, met its burden under United States [v.] Biagase, 50 M.J. 143 [C.A.A.F. 1999]. And it is now incumbent upon the government to illustrate beyond a reasonable doubt that there was not unlawful command influence in this case." After a brief recess, the prosecution called the CA, Commander Douglas G. Morton, CEC, U.S. Navy, to testify.

Contrary to Lieutenant Weber's testimony, Commander Morton, testified that he did not try to influence Chief Metheny's testimony. He testified that he "was taken aback by [defense

14

counsel] coming in my spaces, approaching one of my Chiefs without my knowledge, and asking them or ordering them to come to Pensacola [to testify]. So, I told the Chief I didn't want him to go to Pensacola, and . . . that was all there was to it." He further stated that he was "disturbed" and "really offended" that defense counsel did not approach him, the executive officer, or any command administrative staff prior to speaking with Chief Metheny, particularly since he had already entered into a pretrial agreement with Appellant. Commander Morton stated that he told Chief Metheny that he was "angry that Lieutenant Maye would come into my spaces."

Commander Morton stated, "I was really offended I guess, above all else, that somebody could come in and take one of my people away without my knowledge. So I told the Chief, 'You're not going to go.'" Commander Morton explained that the conversation with Chief Metheny arose because the Chief was advising him that he would be absent from work. Commander Morton testified that his was an "operational unit, ready to deploy" and he and other command members were missing "a very important meeting with our superior discussing our combat readiness to be here." He explained that it "bothered" him that the "request directing to my subordinate . . . was made without any knowledge of the impact to my command."

Commander Morton testified that he was confused and unaware that Appellant would need to have witnesses speak on his behalf at sentencing. He explained that "nobody had made me aware of a need to have anybody speak on [Appellant's] behalf." He testified that he had briefly discussed with Chief Metheny the facts of Appellant's offenses and the terms of the pretrial agreement. He testified that he told Chief Metheny the case was a "done deal." Commander Morton explained that he had "never been in this position to see what a special court actually does. And I thought it was a foregone conclusion that once the [pretrial] agreement was signed [that the case was settled.]"

Commander Morton denied that he had any motivation to prevent Appellant from getting witnesses to speak on his behalf. He asserted that he did not understand that Chief Metheny was going to be a defense witness because he asserted Chief Metheny barely knew Appellant and he did not see how Chief Metheny's testimony was germane.

Additionally, he testified that he did not tell anyone in his command that they could not help Appellant. Commander Morton asserted that he had not done anything to convey the impression to members of his command that their careers would be affected in any manner if they did or did not testify for the Appellant. He expressly denied that he tried to influence Chief Metheny's testimony against Appellant or that he told Chief

16

Metheny that he must "to[e] the company line." He then explained, "Chief Metheny is one to really talk on. He is a Seabee's Seabee. He will do anything for any troop, anytime. I know he can talk and talk. I said, 'Stick to the facts, the facts that you know.' That's all I told him."

Commander Morton stated that he had no ill will toward the Appellant. He denied any knowledge of any questionnaires that were being passed around his command. Finally, he denied that he did anything to influence the court-martial proceedings.

Commander Morton explained that he reconsidered his decision not to permit Chief Metheny to testify when he got a telephone call from the legalman chief, in the base staff judge advocate's office, informing him "that the defense counsel had claimed some - some foul play on my part, that I was limiting Chief Metheny's ability to get there." Commander Morton said that he met with the chief and told him to "go down to Pensacola and answer all questions that you're asked."

The contradictory testimony of the witnesses presented a credibility issue for the military judge. His detailed findings explain his reasons for believing the original defense counsel and Lieutenant Weber and for not believing Chief Metheny and the CA. 58 M.J. 778-84. The military judge found that, "the command acted in a manner which would constitute unlawful command influence" and dismissed the case with prejudice,

17

stating, "The carcinoma that is undue command influence must be cut out and radically disposed of."

The judge reasoned that the CA improperly "controlled" a prospective defense sentencing witness. This resulted in changing the witness's anticipated testimony that Appellant should be retained into testimony that only supported the command decision to court-martial Appellant. In fashioning a remedy of dismissal with prejudice, the military judge stated that "the evil here spreads far beyond the four corners of this case . . . ."

In announcing his findings, the military judge stated:

> The mandate of United States [v.] Biagase, 50 M[.]J[.] 143 [C.A.A.F. 1999] could not be more clear. Undue and unlawful command influence is the carcinoma of the military justice system, and when found, must be surgically eradicated. And this is going to be what we are about to see, the eradication of something that has shocked the consci[ence] of this court.
>
> . . . .
>
> This court was amazed at the absence of knowledge that the convening authority held with regard to issues having to do with trials by court-martial. And the court's confidence in the ability of this officer to convene another court is shaken to the very core. That this officer would so lack-hazardly [sic] and in such a sloppy manner dismiss the importance of a federal court proceeding pertinent to one of his own subordinates is no less appalling.

In the military judge's findings of fact and conclusions of law, following the initial remand by the lower court, he reaffirmed his initial evaluation of the unlawful command

18

influence and its impact on this case. He stated that "there could not be a more crystalline example of unlawful command influence." The judge concluded that the "only remedy that addressed the rabid form of unlawful command influence placed before the [c]ourt was dismissal with prejudice."

The CCA concluded, upon reviewing the additional findings and conclusions that the military judge made, pursuant to its direction, that the CA's unlawful command influence only affected the sentence hearing, and therefore that the military judge had abused his discretion. The lower court ordered that Appellant's case be sent back to the military judge to "select an appropriate remedy, short of dismissal of the charges, commensurate with the degree and extent of the unlawful command influence." 58 M.J. at 788.

Appellant then petitioned this Court for review of the lower court decision and that petition was granted. Appellant asserts that, regarding Issue I, the military judge acted within the limits of his discretion. Regarding Issue II, Appellant contends the lower court exceeded their permissible scope of review by making additional findings of fact. The Government argues that the military judge abused his discretion in dismissing the charges with prejudice and that the lower court did not engage in impermissible fact-finding but instead made logical inferences and conclusions.

19

## II. DISCUSSION

### A. The Factual Basis for the Decision

A preliminary issue before this Court is determining the decisional facts in this case. This requires little discussion as the law controlling this issue is clear and unequivocal. Article 62(b), UCMJ, 10 U.S.C. § 862(b) (2000) states that the lower court in ruling on a government appeal "may act only with respect to matters of law, notwithstanding section 866(c) of this title (article 66(c))." See Rule for Courts-Martial 908(c)(2). This Court has stated:

> When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are "fairly supported by the record." Marshall v. Lonberger, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983), quoting 28 U.S.C. § 2254(d)(8). "[T]o give due deference to the trial bench," a determination of fact "should not be disturbed unless it is unsupported by the evidence of record or was clearly erroneous." United States v. Middleton, 10 M.J. 123, 133 (C.M.A. 1981).

United States v. Burris, 21 M.J. 140, 144 (C.M.A. 1985).

On matters of fact with respect to this Government appeal under Article 62, UCMJ, both this Court and the lower court are in the same position--bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous. Neither court has authority to find facts in addition to those found by the military judge. While the lower court did comment and even expressed some disagreement with some of the findings of the trial judge, the lower court did not find

20

any factual finding of the military judge clearly erroneous. Moreover, we conclude that each of the findings of fact of the military judge are supported by evidence of record and proceed to decide this case relying entirely on the findings of fact made by the trial judge. In light of these matters and our disposition of Granted Issue I, we need not specifically determine whether the lower court found additional facts as suggested by Issue II.

### B. The Military Judge's Remedy for the Unlawful Command Influence

Unlawful command influence is prohibited under Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2000), which states,

> No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case. . . .

The importance of this prohibition is reflected in our observation, that "a prime motivation for establishing a civilian Court of Military Appeals was to erect a further bulwark against impermissible command influence." United States v. Thomas, 22 M.J. 388, 393 (C.M.A. 1986).

21

We need not here revisit the "multitude of situations in which superiors have unlawfully controlled the actions of subordinate in the exercise of their duties under the UCMJ." United States v. Hamilton, 41 M.J. 32, 36 (C.M.A. 1994). See generally United States v. Stombaugh, 40 M.J. 208, 211 (C.M.A. 1994)(detailing "many instances of unlawful command influence" that this Court has condemned).

Addressing the undisputed unlawful command influence in this case, it is important to note that we have repeatedly condemned unlawful command influence directed against prospective witnesses. See United States v. Gleason, 43 M.J. 69, 75 (C.A.A.F. 1995); United States v. Levite, 25 M.J. 334, 340 (C.M.A. 1987); Thomas, 22 M.J. at 393; United States v. Rosser, 6 M.J. 267, 271-72 (C.M.A. 1979). In Thomas, we stated, "The exercise of command influence tends to deprive servicemembers of their constitutional rights. If directed against prospective defense witnesses, it transgresses the accused's right to have access to favorable evidence." 22 M.J. at 393.

Biagase, sets forth the analytical framework for deciding issues involving unlawful command influence. In Biagase, this Court held:

> [O]nce the issue of unlawful command influence is raised, the Government must prove beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command

22

influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence.

50 M.J. at 151.

In Biagase, we reaffirmed, what we first stated in United States v. Rivers, 49 M.J. 434, 443 (C.A.A.F. 1998), that the military judge is the "'last sentinel' to protect the court-martial from unlawful command influence." Id. at 152. In both these cases, we recited with approval the curative action by the military judge to ensure that alleged command influence did not taint the court-martial. These cases recognize this authority and the duty of the military judge to protect the servicemember from unlawful command influence. We recently reaffirmed this point, stating, "This Court has long recognized that, once unlawful command influence is raised, 'we believe it incumbent on the military judge to act in the spirit of the [UCMJ] by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.'"
United States v. Stoneman, 57 M.J. 35, 42 (C.A.A.F. 2002)(quoting Rosser, 6 M.J. at 271).

But these cases do not require that the military judge take any specific action to purge the taint of unlawful command influence. Simply stated, our prior cases have addressed only what a military judge can do, not what the military judge must

23

do, to cure (dissipate the taint of the unlawful command influence) or to remedy the unlawful command influence if the military judge determines it cannot be cured. This distinction has an important impact as to the standard of review in the analysis of a command influence issue.

Biagase and Rivers are illustrative of situations where the military judge took corrective action and concluded it successfully purged the taint of unlawful command influence thereby permitting the trial to proceed. This Court reviewed the military judge's attempt to purge the taint de novo. See Biagase, 50 M.J. at 151; Rivers, 49 M.J. 443. Our task on appeal was also to determine beyond a reasonable doubt if the military judge was successful in purging any residual taint from the unlawful command influence. Biagase, 50 M.J. at 151. Because command influence is pernicious and an anathema to the fairness of military justice, our de novo review ensured that the unlawful command influence had no prejudicial impact on the court-martial.

Unlike both Biagase and Rivers, the present case does not ask us to consider if the military judge was successful in purging the taint from unlawful command influence and permitting the trial to proceed. Here, the judge found unlawful command influence tainted the proceedings. Neither the lower court nor

24

the Government challenges the finding that unlawful command influence tainted the proceedings.

But again, unlike both Biagase and Rivers, the military judge here expressly concluded that "the only remedy that addressed the rabid form of unlawful command influence placed before the [c]ourt was dismissal with prejudice." The military judge dismissed the charges with prejudice to prevent the unlawful command influence from prejudicing Appellant's court-martial. As the remedy of the military judge terminated the proceedings, it is apparent that he was successful. So this Court does not review de novo, as it did in both Biagase and Rivers, whether the prejudice to Appellant's court-martial arising from the unlawful command influence persists after the remedy.

Because the military judge here decided that the command influence could not be cured and dismissed the charges with prejudice, we, therefore, address a different issue than that presented in Biagase and Rivers, where the trial proceeded after remedial action by the military judge. We now consider whether the military judge erred in fashioning the remedy for the unlawful command influence that tainted the proceedings.

We will review the remedy ordered by the military judge in this case for an abuse of discretion, the same standard applied by the lower court and agreed to by both the parties before our

Court.  As we proceed in this review, we are mindful that as to this sensitive issue, the judge's evaluation of the demeanor of the witnesses is most important.  See Stoneman, 57 M.J. at 42-43.

An abuse of discretion means that "when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  United States v. Houser, 36 M.J. 392, 397 (C.M.A. 1993)(citation omitted).  We have also stated, "We will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law."  United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1995).  Further, the abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range.  United States v. Wallace, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992).

We have long held that dismissal is a drastic remedy and courts must look to see whether alternative remedies are available.  United States v. Cooper, 35 M.J. 417, 422 (C.M.A. 1992); See also United States v. Pinson, 56 M.J. 489, 493 (C.A.A.F. 2002) citing (United States v. Morrison, 449 U.S. 361,

364 (1981)(any action taken "had to be 'tailored to the injury suffered'")). When an error can be rendered harmless, dismissal is not an appropriate remedy. United States v. Mechanik, 475 U.S. 66 (1986). This Court explained in United States v. Green, 4 M.J. 203, 204 (C.M.A. 1978), that dismissal of charges is appropriate when an accused would be prejudiced or no useful purpose would be served by continuing the proceedings. Id. (citing United States v. Gray, 22 C.M.A., 443, 445, 47 C.M.R. 484, 486 (1973).

As dismissal of charges is permissible when necessary to avoid prejudice against the accused and the findings of fact of the military judge documented the prejudice to Appellant from the egregious error in this case, we conclude the military judge acted within his discretion to dismiss with prejudice the charges against Appellant. While such remedy should only be imposed when necessary, the military judge here acted within his discretion after making findings of fact relating to the CA's actions to prevent witnesses from testifying on behalf of, and cooperating with, Appellant. We agree with the military judge when he said that, "[t]he mandate of [Biagase] could not be more clear. Undue and unlawful command influence is the carcinoma of the military justice system, and when found, must be surgically eradicated."

27

The military judge precisely identified the extent and negative impact of the unlawful command influence in his findings of fact.  As a result of the commanding officer's order not to testify on behalf of Appellant, the military judge found that Appellant was deprived of the favorable testimony of Chief Metheny.  Testifying before the military judge, Chief Metheny continuously displayed discomfort, failed to recall events that occurred no more than 36 hours prior to testifying, and "left the [c]ourt with the clear belief that [he] was terrified to testify as he might have previously wished."  The military judge found that, prior to testifying, Chief Metheny "alluded to the negative ramifications that would stem from testifying," and "grasp[ed] his collar device and stat[ed] that he had attained his present grade in a shorter period than should have been expected."  Chief Metheny also "indicated that one gets ahead by not bucking the system."  He noted that "he had to recognize that the commanding officer authored his fitness report."  Chief Metheny informed defense counsel "that he had received a phone call from the commanding officer the evening prior to date of trial" and that "if he testified favorably to the accused he would not be promoted to senior Chief.  He further informed detailed defense counsel that if he did testify it would be in a manner consistent with the commands [sic] wishes."

28

The military judge believed Chief Metheny to be testifying falsely when he attempted to minimize the impact of the CA's order for him not to testify on behalf of Appellant. The judge's conclusion stemmed from the fact that Chief Metheny originally indicated to defense counsel that he would testify on behalf of Appellant. Specifically, Chief Metheny stated that he thought Appellant was a "really nice guy" and should be retained. Chief Metheny identified Chief Smith as another individual from the command who also held the same beliefs as himself. However, when Chief Metheny was actually called to testify on behalf of Appellant, he denied volunteering to testify on behalf of Appellant, stated he was not sure why he was there other than perhaps to serve as a command representative, that he did not recall being asked to testify electronically, and that he did not discuss the prospect of appearing as a witness with original defense counsel and Lieutenant Weber.

The military judge rejected Chief Metheny's testimony finding, "His demeanor continued to betray dishonesty, both in the ashen tone of his skin, which varied as his testimony continued, and his constant movement in the witness box." Also, "his face was red and head bowed when answering the question," he appeared to be "acutely uncomfortable," and "his eyes were averted from the direction of the Court." Chief

29

Metheny appeared to the court as being under "considerable duress." He was a man desperate to please his commanding officer. He impressed the court as a witness "who did not feel free to express his true opinions or accurately recount what he knew to be true." The Chief, "under rather intense questioning from the Court finally conceded that he had been told by the commanding officer that he was not going to testify in the case." The military judge found that this concession ran "afoul of the Chief's testimony that he did not know that he was desired as a witness." He conceded to the court that "he did in fact tell detailed defense counsel that it was unwise to buck the system," which caused the court to further question why he testified that he did not believe he would be called as a witness.

The military judge found Lieutenant Weber to be a credible witness that corroborated the scope, degree, and impact of the unlawful command influence on Chief Metheny. Ultimately, the military judge concluded that "in order to determine that no unlawful command influence had been exerted it would have to defy logic, disbelieve two officers of the court and adopt the testimony of Chief Metheny whose erratic, nervous and deceptive deportment and questionable substantive contribution are documented in [my] findings of fact."

The military judge further concluded that the Government failed to prove that the unlawful command influence had no impact on the proceedings. The military judge found that the commanding officer so terrified Chief Metheny that he refused to testify contrary to his commander's orders. Likewise, the commanding officer prohibited questionnaires from being distributed and may have prohibited anyone else in the command from testifying for Appellant. The military judge stated that "[s]ubsequent to the intervention of the Commanding Officer, no member of the command was going to testify for the accused . . . ." Importantly, the military judge specifically found that the Government failed to produce testimony of any alternate defense witnesses from the command. Cf. Rivers, 49 M.J. at 440-43 (finding that remedial measures of the command and military judge to insure availability of defense witnesses purged the effects of unlawful command influence). In light of this "rabid form of unlawful command influence[,]" the judge concluded that "there was no way for the [c]ourt to be sure that the taint of the commanding officer['] s wrongful intervention had not spread beyond its obvious impact on Chief Metheny . . . who was clearly terrified that his career and family would be damaged if he carried out his promise to testify on behalf of the accused." The military judge, therefore, "determined that dismissal with prejudice was the only logical remedy available."

Rejecting alternate remedies, the judge reasoned that dismissing without prejudice and allowing for a re-referral would not eradicate the unlawful command influence because it "would not have removed the pool of prospective witnesses from the firm grasp of an interloping commanding officer who, as Chief Metheny noted, writes the fitness reports of prospective witnesses." The military judge also rejected a "blanket order whereby every witness proposed by the defense would have been accredited with a positive opinion of the accused's rehabilitative potential for further naval service." In fashioning a remedy, the military judge rejected the Government argument that Chief Metheny's "lack of significant contact with the accused somehow vitiates the unlawful command influence." Noting the "special significance" of the testimony of a Chief petty officer, the judge rejected any suggestion that the commanding officer alone could determine what testimony was "germane" to the court-martial. Finally, the military judge stated that "the court also weighed the absence of understanding of the military justice system or his role as a CA on the part of the commanding officer. Accordingly, having concluded that [Appellant] could not be afforded witnesses untainted by the chilling hand of the convening authority," the military judge determined that Appellant would not receive a fair trial and the only available remedy was dismissal with prejudice.

Furthermore, we note the fact that Appellant previously negotiated a pretrial agreement does not in any way undermine the military judge's conclusion. Appellant's negotiation of a pretrial agreement does not mean that he is not entitled to a fair trial, one where witnesses are permitted to testify on behalf of and in support of Appellant. Appellant had not yet entered his pleas and remained free to plead not guilty. We view the possible future guilty plea of Appellant as irrelevant. The military judge was correct in rejecting the commanding officer's view of the case that after the pretrial agreement was signed the case was a "done deal." The circumstances of Appellant's negotiated future guilty plea did not afford the commanding officer license to violate the mandate of Article 37, UCMJ, prohibiting unlawful command influence. Cf. Gleason, 43 M.J. at 75 (considering an offered and accepted plea of guilty untainted by unlawful command influence).

In summary, both parties and the lower court agree that the military judge correctly found that unlawful command influence existed. The military judge's findings of fact were not clearly erroneous and support this conclusion. The military judge's conclusion of prejudice stemming from this unlawful impact in this case is supported by the record. Because Appellant had not yet entered pleas, the CA's interference with potential witnesses affected both Appellant's ability to contest the

charges and to present a sentencing case.  It was within the military judge's discretion to determine that dismissal with prejudice was the appropriate remedy in light of the egregious conduct of the CA that prejudiced Appellant's court-martial.

We hold that the military judge did not abuse his discretion by dismissing the charges against Appellant.  His findings of fact were supported by the evidence and his decision to dismiss with prejudice was within the range of remedies available and not otherwise a clear error of judgment.  Based on this holding, we conclude that the lower court erred in ordering the record to be returned to the military judge to select a different remedy.

## Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed.  The decision of the military judge is reinstated.