# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**Misc. Dkt. No. 2017-03**

————————————

**UNITED STATES**
*Appellant*

**v.**

**David W. BRUNO**
Second Lieutenant (O-1), U.S. Air Force, *Appellee*

————————————

Appeal by the United States Pursuant to Article 62, UCMJ

Decided 23 August 2017

————————————

*Military Judge:* Christina M. Jimenez.

*GCM convened at Barksdale Air Force Base, Louisiana.*

*For Appellant:* Major Tyler B. Musselman, USAF (argued); Colonel Katherine E. Oler, USAF; Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF.

*For Appellee:* Captain Allen S. Abrams, USAF (argued); Lieutenant Colonel Nicholas W. McCue, USAF.

Before MAYBERRY, JOHNSON, and SPERANZA, *Appellate Military Judges.*

Judge SPERANZA delivered the opinion of the court, in which Senior Judge MAYBERRY and Senior Judge JOHNSON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

SPERANZA, Judge:

The Government filed an appeal under Article 62, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862, asserting that the military judge erred when she excluded evidence of Appellee's second urinalysis. The Government

maintains that Appellee's second urinalysis was taken in accordance with a standing inspection order issued by the installation commander and minor deviations in the execution of the policy did not mandate suppression. We agree and find the military judge abused her discretion in excluding the evidence.

## I. BACKGROUND

Appellee is charged with two specifications of wrongful use of methamphetamine in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. The allegations are based, in large part, on Appellee's two positive urinalysis tests. Appellee provided the first urine sample on 2 August 2016 after being selected for random urinalysis. On 23 August 2016, Appellee provided another urine sample for urinalysis under circumstances that ultimately led to this appeal.

Appellee elected to be tried by a military judge alone and raised several motions after arraignment. Accordingly, the parties litigated Appellee's motion to suppress statements he made to the Air Force Office of Special Investigations (AFOSI) and to another military member, Captain (Capt) CVA. After the military judge granted this motion in part and suppressed Appellee's statements to AFOSI and any derivative evidence, trial defense counsel orally raised a motion to suppress evidence of Appellee's second urinalysis test. Trial defense counsel argued:

> [T]he second urinalysis is derivative evidence of the interactions with OSI that was suppressed. I understand that the government's probably operating under the premise that the second urinalysis was the result of a *Bickel*[1] policy; a standing *Bickel* policy. And it's not our position that there is no *Bickel* policy or there's a problem with it, necessarily but, just the way it played out.
>
> . . . .
>
> And the defense is not aware of any authority that says OSI is the enforcer of the *Bickel* policy. It is a command policy run by the Installation Commander, which is essentially delegated and run by the individual Squadron Commander for each squadron to run, and not OSI.
>
> So, it's the defense's position that the second urinalysis was, essentially—not necessarily a lawful order by OSI, but not un-

---

[1] Referencing *United States v. Bickel*, 30 M.J. 277 (C.M.A. 1990).

der the policy of the *Bickel* memo, but instead, OSI directing [Appellee's escort] to take [Appellee] over [to the testing facility]. And there was no testimony that [Appellee's escorts, Capt CVA and Master Sergeant (MSgt) M were] aware of the *Bickel* policy, and that [Appellee] had to go to [Drug Demand Reduction Program (DDRP)] to test, because of a *Bickel* policy that may have been in place at the time.

Trial defense counsel attempted to clarify their position with the military judge by maintaining their motion to suppress the second urinalysis is "based on the legal theory that it's derivative of the OSI interview and OSI's interaction with [Appellee] that day." The military judge summarized the Defense's position as "[the test] did not follow a *Bickel* order." Trial defense counsel agreed with this summation, adding "they were not following the *Bickel* policy; they were following direction from OSI, without any explanation of a *Bickel* policy, which is a Commander's policy, not OSI's policy . . . And improper application of the *Bickel* policy."

After trial counsel ostensibly "fleshed out the defense's argument for how [the second urinalysis] was derivative evidence," the Government initially presented the military judge with the installation commander's re-inspection policy memorandum. The Defense countered with portions of Air Force Instruction (AFI) 90-507, *Military Drug Demand Reduction Program*, and the argument that "a Bickel program is constitutional as a re-inspection, as long as the delineated policy is followed, per the [commander's] written memorandum or standing order." Special Agent (SA) JR, the AFOSI agent who interviewed Appellee just prior to Appellee providing the second urinalysis sample, testified on behalf of the Government. After SA JR's testimony, the parties presented additional argument.

The military judge granted the defense motion and articulated the basis for her ruling orally on the record. The military judge first found the following facts "by at least a preponderance of the evidence:"

> [T]here is a 2d Bomb Wing Commander policy letter issued on 7 June 2016 . . . that, in fact, requires a urinalysis re-inspection upon the specified circumstance, those delineated in paragraph three [of the policy letter].[2] If those conditions are met, then the

---

[2] Paragraph 3 of the policy letter requires mandatory urinalysis for military members:

*(Footnote continues on next page)*

member's commander will order the members following the procedure outlined in AFI 90-507[.][3]

AFI 90-507 provides sample written notification as the means in which to notify a member[.] The accused's commander in this case did not issue an order, oral or written, on or about 23 August 2016 to the accused. The accused was taken by [Capt CVA], his acting supervisor, along with [MSgt CM], the additional duty First Sergeant, and [Capt CVA] was acting by information given to him through OSI. [SA JR] from OSI knew of the 2d Bomb Wing Commander's policy regarding re-inspection of urinalysis [sic]. He likewise had no authority himself to order someone to submit to a urinalysis at DDR and [SA JR] did, by practice, remind or inform inexperienced first sergeants of the wing commander's policy.

The military judge concluded that the squadron commander could have complied with the policy's requirement that he order Appellant to provide a urinalysis sample in accordance with the AFI and the squadron commander simply failed to do so. Consequently, the military judge found nothing to connect Appellant's second urinalysis with the legitimate exercise of command authority and held that the urinalysis failed to meet Mil. R. Evid. 313's requirements.

The Government requested a recess to "discuss the ruling." After the recess, the Government sought reconsideration of the ruling and asked that the military judge's ruling be provided in writing. In support of its reconsideration request, the Government provided the military judge additional portions of AFI 90-507, as well the testimony of Lieutenant Colonel (Lt Col) RK, Appellee's squadron commander, and Capt CVA, Appellee's acting supervisor

---

a. Whose urine sample has a positive result for the presence of any controlled substance, the presence of which is without legal justification or authorization;

b. Whose urine sample is deemed to be "untestable" by the Drug Testing Laboratory, to include samples determined to be a substance other than urine, or urine that has been adulterated or diluted with a foreign substance; and

c. Who are AWOL for more than 8 hours.

[3] Air Force Instruction, 90-507, *Military Drug Demand Reduction Program*, (22 Sep. 2014), establishes the roles and responsibilities within the service's drug demand reduction program, to include command authority, delegation of authority, member testing availability, formal notification, documentation, and testing procedures.

and escort the day of the second urinalysis. The military judge entertained further argument but affirmed her prior ruling in writing.

The military judge "incorporated" her previous oral ruling into her written ruling. The written ruling purported to "clarif[y] and correct[ ] any earlier findings and law applicable to the issue[.]" The military judge first "adopt[ed] as fact for the purposes of [her] ruling all matters contained within [Urinalysis Re-Inspection Policy and the AFI 90-507 excerpts] as accurately reflecting the items or information identified therein."

The "Urinalysis Re-Inspection Policy" refers to a memorandum from the 2d Bomb Wing commander (2 BW/CC). This memorandum is styled and reads, in pertinent part, as follows:

> MEMORANDUM FOR   ALL MILITARY PERSONNEL
> TESTED UNDER AUTHORITY OF
> THE BARKSDALE AFB DRUG
> DEMAND REDUCTION PROGRAM
>
> FROM:  2 BW/CC
>
> SUBJECT:  Urinalysis Re-Inspection Policy
>
> 1. This memorandum outlines my policy, as the Barksdale AFB installation commander, of requiring military personnel tested under my authority of the Barksdale AFB Drug Demand Reduction Program to report for urinalysis re-inspection following a positive, inconclusive, or diluted test or after having been absent without leave (AWOL). Those members who meet any of the criteria below will be required to submit to follow-up urinalysis testing by the Barksdale AFB Drug Demand Reduction Program as a re-inspection.
>
> 2. The unlawful use of controlled substances by a military member has the potential to seriously undermine our mission and endanger the lives of other members of my command as well as other personnel and missions we support. The purpose of random urinalysis inspection, to include unit sweeps, is to determine and ensure the safety, security, military fitness, readiness, and good order and discipline of military members. The random urinalysis inspection program requires service members to be randomly selected for urinalysis and to report to the testing facility to provide a urine sample. Follow-up testing and re-inspection will be used as a continuation of the original inspection. These urinalysis inspections are part of my random urinalysis program, and not a criminal investigative tool, re-

gardless of the admissibility of such test results as evidence in Uniform Code of Military Justice actions.

3. All military personnel, to include Reservists and Air National Guard in Title 10 status (Inactive Duty Training, Active Duty, and/or Annual Training), and personnel located at Geographically Separated Units (GSUs), who meet one or more criteria listed below will be required to report for a urinalysis inspection of the first duty day following receipt of the test report. Members subject to mandatory re-testing include military tested under the authority of the Barksdale AFB Drug Demand Reduction Program:

    a. Whose urine sample has a positive result for the presence of any controlled substance, the presence of which is without legal justification or authorization;

    b. Whose urine sample is deemed to be "untestable" by the Drug Testing Laboratory, to include samples determined to be a substance other than urine, or urine that has been adulterated or diluted with a foreign substance; and

    c. Who are AWOL for more than 8 hours.

4. Upon notification that a member meets a criterion listed above in paragraph 3, the member's commander will order the member, IAW procedures in AFI 90-507, Military Drug Demand Reduction Program, to submit to follow-up urinalysis testing or re-inspection. This is not to be confused with "commander-directed urinalysis." If the member is on leave or TDY at the time of the positive test result notification, the commander will order the urinalysis immediately upon the member's return to duty. Follow-up testing and re-inspection shall be repeated until a negative result is received by the testing facility. All other urinalysis testing policies remain in effect.

The military judge also found the following relevant facts "by at least a preponderance of the evidence:"

[ ] Lt Col RK became . . . the [Appellee's] commander. Prior to taking command he attended the commander's course hosted by his [Major Command (MAJCOM)]. In 24 years of active duty, this is his first command. [Appellee's] case is the first time a member of his command tested positive in a urinalysis (and the only one to date).

6

[ ] When DDR receives a positive urinalysis, it forwards the information to the medical review officer, Capt [AC], for a full medical records search. Capt [AC] reviewed [Appellee's] records that covered the last eight years and prescriptions from 2011 through 2014.

. . . .

[ ] On 23 August 2016, Lt Col [RK] received an email from Drug Demand Reduction (DDR) indicating [Appellee] tested positive in an earlier random urinalysis. Lt Col [RK] was informed of the name of the drug [Appellee] tested positive for and looked up the drug on google. . . . He then called and spoke with a member of the legal office for advice, after which he called OSI as directed by the legal advice. No one advised Lt Col [RK] on the 2 BW/CC urinalysis re-inspection policy or its existence.

[ ] On 23 August 2016, Capt [CVA], [Appellee's] acting supervisor since May 2016, and MSgt [CM], the additional duty first sergeant, escorted [Appellee] to OSI after learning [Appellee] had a positive urinalysis. . . .

[ ] SA [JR], OSI, questioned [Appellee] about amphetamine use and later told [Appellee] he was investigating the alleged offense of "Article 112" (without clarification or correction). . .

[ ] After OSI completed its processing of [Appellee], Capt [CVA] and MSgt [CM] returned to OSI to pick up [Appellee]. SA [JR] knew that per the 2 BW/CC's urinalysis re-inspection policy "anytime there was a hot urinalysis" there was an "automatic" retest, although he did not know the policy required an accused's commander to order an accused to re-test. SA [JR] knew he did not have authority to order [Appellee] to submit to a re-inspection urinalysis at DDR on 23 August 2016. SA [JR] did not order [Appellee] to DDR or to accomplish a re-inspection urinalysis. It was SA [JR's] practice in over 40 drug cases to remind inexperienced first sergeants of the wing urinalysis re-inspection policy when they picked up a subject.

[ ] OSI did not provide Capt [CVA] or MSgt [CM] any information as to what [Appellee] said or what occurred during the preceding, approximate two hours at the OSI detachment. Per OSI's direction, Capt [CVA] and MSgt [CM] took [Appellee] to DDR after departing OSI in order for [Appellee] to submit to a urinalysis. Capt [CVA] understood DDR to be "part of the pro-

cess" and told [Appellee] the same. Capt [CVA] did not know about the wing's urinalysis re-inspection policy until sometime after 24 August 2016. Capt [CVA] did not order [Appellee] to DDR or to submit to a re-inspection urinalysis.

[ ] Capt [CVA] escorted [Appellee] directly to DDR and once signed into DDR, Capt [CVA] told [Appellee] he could not leave DDR until he provided a sample. Per observer training, Capt [CVA] believed [Appellee] had to remain in DDR once [Appellee] handed over his military identification and until he provided a urine sample. Capt [CVA] did not hear MSgt [CM] convey any order to [Appellee] that he had to submit to a urinalysis re-inspection.

[ ] Lt Col [RK] received telephonic updates from his personnel on the status of [Appellee's] whereabouts and the investigation. On 23 August 2016, one such phone call alerted Lt Col [RK] to the existence of the wing commander's urinalysis re-inspection policy as [Appellee] was in route [sic] to DDR. Lt Col [RK] was not aware of the policy prior to receiving the phone call informing him [Appellee] was being taken to DDR. The phone call was informational only and Lt Col [RK] acknowledged receipt of the information. Lt Col [RK] did not read the policy until sometime after 23 August 2016. Lt Col [RK] did not order [Appellee], either verbally or in writing, to submit to a re-inspection urinalysis per the 2 BW/CC's policy.

In addition to finding the aforementioned facts in her written ruling, the military judge wrote "Further findings of the Court shall be addressed below, and shall be based upon at least a preponderance of the evidence."

The military judge found the Government "failed to meet its burden of clear and convincing evidence that the collection and drug testing of [Appellee's] urine on 23 August 2016, was accomplished as part of a lawful inspection based on [Appellee's] prior positive drug test." Consequently, the military judge concluded the second urinalysis "was not conducted pursuant to an inspection under [Mil. R. Evid.] 313, and is therefore an unlawful intrusion of [Appellant's] privacy and is suppressed." The Government lodged this timely appeal in response.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to hear this appeal under Article 62(a)(1)(B), UCMJ, 10 U.S.C. § 862(a)(1)(B), which authorizes the Government to appeal "[a]n order or ruling which excludes evidence that is substantial proof of a fact ma-

terial in the proceeding" in a court-martial where a punitive discharge may be adjudged.

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). The military judge's findings of fact are reviewed for clear error, but her conclusions of law are reviewed de novo. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004). However, "[a] military judge abuses h[er] discretion when h[er] findings of fact are clearly erroneous, when [s]he is incorrect about the applicable law, or when [s]he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). "In reviewing a ruling on a motion to suppress, we consider the evidence in the light most favorable to the prevailing party." *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citing *Keefauver*, 74 M.J. at 233).

Because this issue is before us pursuant to a Government appeal, we may act only with respect to matters of law. Article 62(b), UCMJ. We may not make findings of fact, as we are limited to determining whether the military judge's factual findings are clearly erroneous or unsupported by the record. *United States v. Lincoln*, 42 M.J. 315, 320 (C.A.A.F. 1995). "When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are 'fairly supported by the record.'" *Gore*, 60 M.J. at 185 (quoting *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985)). "In an Article 62, UCMJ, petition, this Court reviews the military judge's decision directly and reviews the evidence in the light most favorable to the prevailing party at trial." *United States v. Wicks*, 73 M.J. 93, 98 (C.A.A.F. 2014) (citing *United States v. Baker*, 70 M.J. 283, 287–88 (C.A.A.F. 2011)).

## III. DISCUSSION

When the Defense moves to suppress evidence obtained from searches and seizures, "the prosecution has the burden of proving by a preponderance of the evidence that the evidence was not obtained as a result of an unlawful search or seizure[.]" Mil. R. Evid. 311(d)(5)(A).

Evidence obtained from a lawful inspection in the Air Force is admissible at trial when relevant and not otherwise inadmissible under the Military Rules of Evidence. Mil. R. Evid. 313(a).

A lawful inspection is generally

an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, *conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle.*

Mil. R. Evid. 313(b) (emphasis added).

The authority to order an inspection under [Mil. R. Evid.] 313 is directly tied to a commander's inherent authority; it is the connection with command authority, and the commander's responsibility to ensure fitness of a unit, that keeps a valid inspection scheme within constitutional parameters. This tie, or connection, between the inspection and command authority is important in justifying the reasonableness of what is otherwise a warrantless search.

*United States v. Miller*, 66 M.J. 306, 308 (C.A.A.F. 2008) (citations omitted) (citing *United States v. Bickel*, 30 M.J. 277, 280, 282, 285–86 (C.M.A. 1990)).

Despite finding Appellee was subject to the installation commander's "valid *Bickel* follow-up urinalysis policy" and, in fact, met one of the policy's criteria requiring he submit to re-inspection after he tested positive for the presence of a controlled substance without legal justification or authorization, the military judge concluded "[Appellee's] urine sample was not collected at the direction of his commander or *any commander*." (Emphasis added.)

In her analysis, the military judge identified the first "issue" as "whether the 2 BW/CC's identification of certain officials with responsibility is to the restriction of all others, and a requirement to effective implementation of an inspection pursuant to this policy." She resolved this issue by finding, "It is and it does. Those under the 2 BW/CC are obligated to follow his policy, as he expressed it."

The "next question," according to the military judge, was "whether such an official ordered the [Appellee] in this instance [to submit to follow-up urinalysis testing or re-inspection] as set forth in the policy." The military judge found that such an order was never issued.

Accordingly, the military judge reasoned that,

There is no reason the [unit] commander could not have complied with the wing commander's policy and he did so in the first urinalysis in this case. There's also no reason he could not have complied later that same day. There is no prevention of

> ordering someone to pee, again. Without the order from the [unit] commander, the presence of [Appellee] at DDR on the 23rd of August 2016, existed solely under the auspices of [Capt CVA] bringing him there. [Capt CVA] had already taken him to OSI that day indicating some authority over him, and clearly, [Capt CVA] had no authority to issue a re-inspection of a urinalysis.
>
> Under these facts, there's *nothing* that connects [Appellee's] presence at DDR and subsequent urinalysis with the legitimate exercise of command authority. As [Appellee's] urinalysis test was not an incident [of] command and did not comply with the 2d Bomb Wing Commander's policy or MRE 313. Operating a urinalysis re-inspection program on autopilot without command input, as was done here, neither constitutes a legitimate order to test nor satisfies the requirements of MRE 313.

(Emphasis added.)

In the military judge's estimation, "[t]he discrepancies in the execution of this policy are more than mere technicalities and undermine its legitimacy." Thus, the military judge found that the unit commander's failure to fulfill the policy's purely ministerial function of notifying Appellee, through an order in accordance with the Air Force instruction, rendered Appellee's second urinalysis "an unlawful search without probable cause" and "an unlawful intrusion of [Appellee's] privacy." We find that the military judge abused her discretion in reaching such conclusions.

The critical question is not whether Appellee's unit commander or some other subordinate on the installation lawfully ordered Appellee to submit to the mandatory urinalysis as established in the installation commander's re-inspection policy, but rather, whether Appellee's second urinalysis was a re-inspection conducted as an incident of command consistent with Mil. R. Evid. 313. *See Miller*, 66 M.J. at 310 (Baker, J., dissenting). We answer this question by agreeing with trial defense counsel's assessment of Appellee's second urinalysis—"[I]t's obviously a re-inspection."

Appellee's second urinalysis was conducted as an incident of the 2d Bomb Wing Commander's authority as set forth in what the military judge correctly found to be a "valid *Bickel* follow-up urinalysis testing policy [that] was in effect for military personnel tested under the authority of the Barksdale AFB drug demand reduction program." Moreover, no deviations from a regulation or instruction that sets out the procedures for collection, transmission or testing of Appellee's second urine sample allegedly occurred; thus, evidence of the second urinalysis is sufficiently reliable. *See United States v. Pollard*, 27 M.J.

376, 377 (C.M.A. 1989). The only matter in issue is how Appellee happened to arrive at the testing facility to provide a urine sample.

Upon the legal office's advice, Appellee's inexperienced commander directed Capt CVA and MSgt CM to escort Appellee to AFOSI, where Appellee was interviewed by SA JR. SA JR was aware of the installation commander's inspection policy and its standing order that military members on the installation whose urine previously tested positive for the presence of a controlled substance without legal justification or excuse be "automatic[ally] retest[ed]." As part of his standard practice or procedure, SA JR would remind a subject's escorts of the installation commander's re-inspection policy requiring "automatic" retesting and that the subject was required to go to the testing facility for follow-on urinalysis. Accordingly, SA JR reasonably advised Appellee's escorts, Capt CVA and MSgt CM, to take Appellee to the testing facility so Appellee could be retested. SA JR's purpose in advising the escorts was to ensure that they were aware of the installation commander's re-inspection policy. SA JR did not issue an independent re-inspection order on behalf of AFOSI or in furtherance of his investigation. The escorts reasonably took Appellee to the testing facility for another urinalysis as "part of the process"[4]— pursuant to the "valid *Bickel* follow-up urinalysis testing policy." Appellee's urine sample was properly collected and tested. Under these facts, Appellee's presence at DDR and subsequent urinalysis are connected directly to the 2d Bomb Wing Commander's legitimate exercise of command authority.

The military judge found *nothing* to connect Appellee's presence at DDR and second urinalysis to a legitimate exercise of command authority because her analysis was guided by an incorrect view and application of Mil. R. Evid. 313.[5] Importantly, the military judge erred by focusing on the unit command-

---

[4] During his testimony on the motion, Capt CVA was examined by the military judge and explained OSI's directions as follows:

> Q. To the greatest extent possible do you remember what OSI said to you when you and [MSgt CM] went to pick up [Appellee]?
>
> A. All they explained to us, ma'am, it was that simple, that the next step for [Appellee], as part of the process was to take him over to DDRP and provide a urine sample. They did say that the urine sample was already ordered and they would be expecting us to arrive—the test, not the sample, but the test.

[5] The military judge first abused her discretion by erroneously holding the Government to the higher burden of proof—clear and convincing evidence—applicable to examinations to locate and confiscate weapons or contraband without making the Rule's requisite preliminary findings. *See* Mil. R. Evid. 313(b)(3).

er's failure to order Appellee to submit to the re-inspection in accordance with AFI 90-507, as required by the installation commander's policy. She found, "While [Appellee's] commander did have authority to order [Appellee] to submit to a urinalysis retest, no military order in fact provided the means for compelling [Appellee] to provide the specimen." However, Mil. R. Evid. 313 does not require the subordinate "command input" upon which the military judge insists. The installation commander's re-inspection policy properly removes discretion from subordinate commanders and merely imposes an administrative responsibility upon those commanders to—as the military judge acknowledged—"effective[ly] implement[ ] an inspection pursuant to this policy." To require the command input seemingly endorsed by the military judge would only provide "the opportunity for arbitrariness" such re-inspection policies seek to eliminate. *See Bickel*, 30 M.J. at 286. Here, the installation commander's choice to enhance the management or effectiveness of his policy by requiring his subordinate commanders to order, in accordance with AFI 90-507, military members who meet the mandatory retesting criteria to submit to urinalysis as a continuation of the original inspection, although permissible, is not required. *See Miller*, 66 M.J. at 310 (Baker, J., dissenting). Such a requirement "is for the benefit of the service, not the individual, and does not create an individual right to exclude evidence under [Mil. R. Evid.] 313." *Id*. The military judge abused her discretion in creating such a right and suppressing relevant evidence obtained from a lawful re-inspection.

## IV. CONCLUSION

The appeal of the United States under Article 62, UCMJ, is **GRANTED**. The military judge's ruling to grant the defense motion to suppress evidence of Appellee's 23 August 2016 urinalysis is **REVERSED**. The record is returned to The Judge Advocate General for remand to the military judge for action consistent with this opinion.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court