UNITED STATES, Appellee

v.

Jemima HARVEY, Lance Corporal
U.S. Marine Corps, Appellant

No. 04-0801

Crim. App. No. 200001040

United States Court of Appeals for the Armed Forces

Argued October 11, 2005

Decided September 22, 2006

GIERKE, C.J., delivered the opinion of the Court, in which
EFFRON and ERDMANN, JJ., joined.  CRAWFORD, J., and BAKER, J.,
each filed a separate dissenting opinion.

Counsel

For Appellant:  Captain Peter H. Griesch, USMC (argued);
Lieutenant Colin A. Kisor, JAGC, USNR, and Major Charles R.
Zelnis, USMC (on brief).

For Appellee:  Lieutenant Craig A. Poulson, JAGC, USNR (argued);
Lieutenant Colonel W. K. Lietzau, USMC, and Commander Charles N.
Purnell II, JAGC, USN (on brief).

Military Judge:  J. F. Havranek


**This opinion is subject to revision before final publication**.

Chief Judge GIERKE delivered the opinion of the Court.

This Court has repeatedly reaffirmed that the military judge is the "last sentinel" in the trial process to protect a court-martial from unlawful command influence.[1]  Here, the primary issue is whether the military judge properly performed his sentinel duties when confronted with some unusual circumstances surrounding the convening authority being present in the courtroom during a portion of the court-martial.  We hold that these trial developments raised the issue of unlawful command influence.  The military judge failed to inquire adequately into this issue and failed to place the appropriate burden on the Government to rebut the existence of the command influence or to establish that it did not prejudice the proceedings.  Therefore, the military judge erred in failing to perform his sentinel duties.  For the reasons stated below, we reverse the decision of the lower court.

At the outset we note that we granted review on three issues.[2]  Here, we focus on Issue I (the unlawful command

---

[1] United States v. Gore, 60 M.J. 178, 186 (C.A.A.F. 2004); United States v. Biagase, 50 M.J. 143, 152 (C.A.A.F. 1999); United States v. Rivers, 49 M.J. 434, 443 (C.A.A.F. 1998).

[2] This Court granted review on Issue I and Issue II and specified Issue III as follows:

> I.  WHETHER THE LOWER COURT ERRED IN AFFIRMING THE MILITARY JUDGE'S DENIAL OF A MISTRIAL, WHEN THE MILITARY JUDGE FAILED TO INQUIRE INTO THE CIRCUMSTANCES OF THE CONVENING AUTHORITY'S PRESENCE AT TRIAL OR TO REQUIRE THE GOVERNMENT TO DISPROVE THE

2

influence issue) and also address Issue II (denial of speedy

appellate review).  Appellant's claim as to Issue II is

meritorious, thereby entitling her to additional relief.  But

the merits of Issue II also impacts the remedy we fashion to

address the error relating to Issue I.  Because of the error

relating to unlawful command influence and the remedy we find

appropriate, it is not necessary for us to address Issue III

(improper sentence reassessment).

## I.  BACKGROUND

The operative facts are not in dispute and are presented

accurately by the lower court:

> The convening authority at the time the appellant's
> court-martial was convened and the charges referred was
> Major P.J. Loughlin, United States Marine Corps, Commanding
> Officer of Headquarters and Headquarters Squadron (H&HS),
> Marine Corps Air Station, Yuma, Arizona.  He signed the
> convening order, detailing five officer members.  He also
> signed the amendment to the convening order detailing four
> enlisted members and removing an officer member.  After

---

EXISTENCE OF UNLAWFUL COMMAND INFLUENCE ONCE THAT
ISSUE WAS RAISED.

II.  WHETHER A DELAY OF 2031 DAYS BETWEEN SENTENCING AND
CONCLUSION OF REVIEW UNDER ARTICLE 66, UCMJ, COMPORTS
WITH DUE PROCESS.

III. WHETHER THE SENTENCE WAS PROPERLY REASSESSED AFTER THE
CONVENING AUTHORITY DISAPPROVED A GUILTY FINDING BUT
NEITHER THE STAFF JUDGE ADVOCATE'S RECOMMENDATION NOR
THE CONVENING AUTHORITY'S ACTION REFLECTS COGNIZANCE
OF THE SENTENCE REASSESSMENT CRITERIA UNDER UNITED
STATES V. SALES, 22 M.J. 305 (C.M.A. 1986), AND WHERE
THE LOWER COURT FAILED TO REVIEW THE CONVENING
AUTHORITY'S REASSESSMENT UNDER THE SALES CRITERIA.

United States v. Harvey, 61 M.J. 50 (C.A.A.F. 2005).

challenges, one officer and three enlisted members remained to hear the case.  By the time trial on the merits commenced before those four members, Lieutenant Colonel M.L. Saunders had succeeded Major Loughlin in command and Major Loughlin assumed duties as Executive Officer [XO].  After the trial counsel finished his closing argument on findings, there was a brief recess before the military judge gave instructions to the members.  After the recess, in an Article 39a, UCMJ, session, the following discussion ensued:

> MJ:  The court will come to order.  All parties present when the court recessed are again present.
>
> The members are absent.
>
> During the last recess -- I guess I should say during the closing arguments of counsel the courtroom was pretty full of spectators.  I saw an individual come in, sit down in the courtroom.  During the last recess I just said to the trial counsel, who's the man in the flight suit?  He told me it was the XO of the Squadron which happens to be our convening authority in this case, the individual [who] actually picked the members, referred the case to trial, sat in on closing arguments.  I want to make that part of the record.
>
> Defense, do you want to be heard on this?
>
> DC:  Yes, sir, we do.  We'd like to ask for a mistrial at this point because of his presence.  It was obvious -- I didn't know he was there at the time.  It with [sic] obvious during the whole closing argument that the panel was looking over our shoulder.
>
> MJ:  I didn't see that.
>
> DC:  We believe Captain Cisneros, the President, is intimately familiar with Major Loughlin.
>
> MJ:  Well, she may be the only individual that knows him because the other enlisted members are not from that Squadron and I have no idea whether they even recognized or knew who he was.  I can tell you that I'm about as far away from him as they were and I couldn't even tell whether he was an officer or not because he was in a flight suit.  I couldn't see any rank insignia on his name patch.

DC:  But Captain Cisneros knows him.

MJ:  Oh, I know she does.

DC:  And it's a small base.  Everybody knows the XO of H&HS.  It's our opinion that he's going to influence their deliberation and influence the weight.  He heard all the evidence, you know, and they're going to be influenced by that fact.

MJ:  Okay.  Your motion for a mistrial is denied.  But, if you desire, I will give a limiting instruction, but that's a choice you're going to have to make on the limiting instruction in whether you want to highlight it to the members, specifically if the enlisted members did not know who he was, or whether you want me to give them a limiting instruction telling them that they should not consider it whatsoever, the fact that the convening authority sat in for the closing arguments.

DC:  No, we're not going to highlight it at this time.

MJ:  Do you have any other remedy that you would desire?

DC:  There's no other remedy that would be effective other than a mistrial, but that's not an option.

MJ:  Well, you're not getting a mistrial so is there anything else you want?

DC:  Nothing else we can ask for.

MJ:  Then I'll be glad to give a limiting instruction.

DC:  No, sir.

MJ:  Do you desire to voir dire any of the members?

DC:  No, sir.

MJ:  Anything else we need to take up?

TC:  No, sir.

MJ:  Staff Sergeant Perez, let's call the members in.

The Article 39(a) session terminated.[3]

Following the session pursuant to Article 39(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 839(a) (2000), the military judge, the trial counsel, and the trial defense counsel took no further action to address the issue of unlawful command influence. The court-martial eventually convicted Appellant on charges of conspiracy, false official statement, wrongful use of lysergic acid diethylamide (LSD), methamphetamine, and cocaine, wrongful inhalation of "Glade" aerosol with the intent to become intoxicated, wrongful possession of methamphetamine and cocaine, and communication of a threat (two specifications).[4]

On appeal Appellant asserts that the military judge failed to conduct further inquiry to establish what impact, if any, the convening authority's presence had on the proceedings and erred in summarily denying the defense's motion for mistrial. More specifically, Appellant makes four points to support this argument: (1) the facts surrounding the convening authority's presence in the courtroom satisfy the low threshold in Biagase[5] of demonstrating some evidence of unlawful command influence;

---

[3] United States v. Harvey, 60 M.J. 611, 613-14 (N-M. Ct. Crim. App. 2004).
[4] These offenses are punishable under Articles 81, 107, 112a, and 134, UCMJ, 10 U.S.C. §§ 881, 907, 912a, 934 (2000), respectively. Appellant was sentenced to confinement for sixty days, reduction to pay grade E-1, forfeiture of $639.00 pay per month for two months, and a bad-conduct discharge. The convening authority disapproved the finding of guilty of wrongful use of LSD and approved the sentence as adjudged.
[5] 50 M.J. at 150.

(2) the military judge failed to conduct further inquiry to establish what impact the convening authority's presence had on the proceedings; (3) the military judge erred in failing to shift the burden to the Government to disprove the existence of unlawful command influence; and (4) the Government did not adequately rebut the presumption of unlawful command influence beyond a reasonable doubt.

The Government reply is simply that the military judge did not abuse his discretion in denying the defense motion for a mistrial. The Government asserts that the mere presence of the convening authority at the closing argument does not raise the issue of unlawful command influence as there was no evidence that his presence had any effect on the members' deliberations. Indeed, the Government argues that "the presence of the convening authority should be presumed to have a salutary effect" because it "demonstrates to all participants and the command the convening authority's interest" in observing military justice in action.

## II. DISCUSSION

### A. Issue I: Alleged unlawful command influence

#### 1. The analytical framework for addressing the issue of unlawful command influence

Recently in Gore, we discussed the statutory prohibition against unlawful command influence and explained the pivotal

role of this Court in protecting against unlawful command

influence, stating:

> Unlawful command influence is prohibited under Article
> 37(a), UCMJ, 10 U.S.C. § 837(a) (2000), which states,
>
>> No authority convening a general, special, or summary
>> court-martial, nor any other commanding officer, may
>> censure, reprimand, or admonish the court or any
>> member, military judge, or counsel thereof, with
>> respect to the findings or sentence adjudged by the
>> court, or with respect to any other exercises of its
>> or his functions in the conduct of the proceedings.
>> No person subject to this chapter may attempt to
>> coerce or, by any unauthorized means, influence the
>> action of a court-martial or any other military
>> tribunal or any member thereof, in reaching the
>> findings or sentence in any case. . . .
>
> The importance of this prohibition is reflected in our
> observation, that "a prime motivation for establishing a
> civilian Court of Military Appeals was to erect a further
> bulwark against impermissible command influence." United
> States v. Thomas, 22 M.J. 388, 393 (C.M.A. 1986).[6]

Our responsibility to protect the military justice system

against unlawful command influence comes from our statutory

mandate to provide oversight of the military justice system.[7]  We

share this responsibility with military commanders, staff judge

advocates, military judges, and others involved in the

administration of military justice.  Fulfilling this

responsibility is fundamental to fostering public confidence in

the actual and apparent fairness of our system of justice.  It

---

[6] 60 M.J. at 185 (ellipsis in original).

[7] See Articles 37(a) and 98, UCMJ, 10 U.S.C. §§ 837(a), 898
(2000); see also Noyd v. Bond, 395 U.S. 683, 695 (1969)
(recognizing that it was in this Court that "Congress has
confided primary responsibility for the supervision of military
justice in this country and abroad").

is the experience of this Court that unlawful command influence is not a virus that a one-time judicial remedy, treatment, or inoculation can irrevocably extinguish from our military justice community.[8]  On the contrary, because the inherent power and influence of command are necessary and omnipresent facets of military life, everyone involved in both unit command and in military justice must exercise constant vigilance to protect against command influence becoming unlawful.

Illustrative of this shared responsibility to protect against unlawful command influence, in Biagase,[9] we explicitly stated that a primary duty of the military judge in a court-martial is to protect against unlawful command influence. Indeed, Biagase underscored the role of the military judge as the "last sentinel," an essential guard at the trial level, to protect against unlawful command influence.[10]

Biagase reaffirms the unique and important duties that military judges have when addressing command influence issues. We noted in Biagase the utility of the military judge making detailed findings of fact.  But the focus of Biagase is on the

---

[8] See United States v. Stombaugh, 40 M.J. 208, 211 (C.M.A. 1994) (detailing "many instances of unlawful command influence" that this Court has condemned).
[9] 50 M.J. at 152.
[10] In Biagase, we reaffirmed what we first stated in Rivers, 49 M.J. at 443, that the military judge is the "'last sentinel' to protect the court-martial from unlawful command influence." Id.; see Patricia A. Ham, Revitalizing the Last Sentinel:  The Year in Unlawful Command Influence, Army Law., May 2005, at 1.

military judge's duty to allocate the burdens between the prosecution and the defense.

In discharging his duty of allocating the burden, the military judge engages in a two-stage process to permit the parties to establish the factual predicate related to any issues of unlawful command influence. The military judge initially requires the defense to carry the burden of raising an unlawful command influence issue. This threshold showing must be more than mere "command influence in the air"[11] or speculation.[12] But because of the congressional prohibition against unlawful command influence and its invidious impact on the public perception of a fair trial, we have stated that this threshold is low.[13] The test is "some evidence" of "facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings."[14]

If the military judge concludes that the defense has raised the issue of unlawful command influence, the burden shifts to the government to show either that there was no unlawful command

---

[11] United States v. Johnson, 54 M.J. 32, 34 (C.A.A.F. 2000) ("However, 'proof of [command influence] in the air, so to speak, will not do.'" (quoting United States v. Allen, 33 M.J. 209, 212 (C.M.A. 1991))).
[12] Biagase, 50 M.J. at 150 (citing United States v. Johnston, 39 M.J. 242, 244 (C.M.A. 1994)).
[13] Id. (citing Johnston, 39 M.J. at 244).
[14] Id. (citations and quotation marks omitted).

influence or that the unlawful command influence did not affect the proceedings.[15]  In Biagase, we set forth the three options available to the government:  "[T]he Government must prove beyond a reasonable doubt:  (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence."[16]

The Biagase analysis we have established for the military judge is rooted in the approach that we have applied on appeal for over a decade.  "On appeal, an appellant must '(1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness.'"[17]

With this well-established analysis to evaluate allegations of unlawful command influence, we proceed to apply this analysis in this case.

2.  Our evaluation of both the military judge and the lower court considering the command influence issue

The lower court shared the apparent view of the military judge that the defense did not meet its burden of raising the

---

[15] Id. at 151.

[16] Id.

[17] United States v. Dugan, 58 M.J. 253, 258 (C.A.A.F. 2003) (citing Stombaugh, 40 M.J. at 213).

issue of unlawful command influence.[18] The lower court reasoned that the mere presence of the convening authority was insufficient to raise the issue of unlawful command influence and that the trial defense counsel only had presented "an unsupported allegation . . . [supported only by] speculation."[19] Specifically, the lower court explained that there was no evidence that the members either saw or recognized the convening authority, or that his presence influenced the members.[20]

In light of the ruling of both the military judge and the lower court, the pivotal issue is whether the trial defense counsel carried the initial burden of raising the unlawful command influence issue. Our sole concern here is whether the defense produced "some evidence" of "facts which, if true, constitute unlawful command influence and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings."[21] We review this issue de novo.[22]

---

[18] Harvey, 60 M.J. at 614.
[19] Id.
[20] Id.
[21] Biagase, 50 M.J. at 150 (citations and quotation marks omitted).
[22] United States v. Wallace, 39 M.J. 284, 286 (C.M.A. 1994) ("Where the issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that this Court reviews de novo.").

At the outset we hold that there are errors in the analysis of both the lower court and the military judge. Indeed, we conclude that the military judge erred in applying the Biagase analysis. First, he erred in concluding that the defense had not produced "some evidence" sufficient to raise the issue of unlawful command influence. Second, having made this error, the military judge never shifted the burden to the Government to prove there was no unlawful command influence.

As both the lower court and the military judge erred in concluding that the defense had not produced "some evidence" sufficient to raise the issue of unlawful command influence, we address this error first.[23]

In our view, the record establishes the low threshold of "some evidence" to raise the issue of unlawful command influence.[24] To his credit, the military judge spotted the potential unlawful command influence issue but then failed to apprehend the significance of this issue in the context of the trial developments.

At trial it was the military judge who lanced open the unlawful command influence issue when the convening authority

---

[23] See Dugan, 58 M.J. at 258 (holding that both the lower court and the military judge erred in concluding that the appellant did not meet the initial burden of raising the issue of unlawful command influence).

[24] Id. (holding that "to the extent the military judge and the Court of Criminal Appeals concluded Appellant did not meet his initial burden of raising the issue of unlawful command influence, they erred").

appeared in the courtroom during the closing arguments. The military judge raised the issue of command influence in an ex parte inquiry to the Government counsel at the first available recess. Major (MAJ) Loughlin's appearance created enough of a concern that the military judge then felt it necessary to raise the issue on the record in an Article 39(a), UCMJ, session.

Several circumstances made the convening authority's presence in the courtroom particularly problematic. First, MAJ Loughlin was wearing his flight suit when he entered the courtroom, and throughout the trial of this case the Government characterized Appellant's misconduct as a direct threat to the safety of the aviation community.

Second, although the military judge explicitly stated that he had "no idea" whether the members recognized MAJ Loughlin or whether they knew who he was, the trial developments were inconsistent with this assertion, and in fact established the members' knowledge of the convening authority. We acknowledge that trial defense counsel, as an officer of the court, characterized the relationship between MAJ Loughlin and the senior member as "intimately familiar."[25] But what we also consider important here is that trial defense counsel had unsuccessfully challenged for cause the senior member because

---

[25] We afford this assertion little weight, as the voir dire of this member had already established that there was no "relationship" between this member and the convening authority.

14

she personally knew the convening authority and was a subordinate member of his command.  Indeed, the military judge expressly acknowledged that the senior member and MAJ Loughlin knew each other.

Third, the trial defense counsel specifically asserted that it was "obvious during the whole closing argument that the panel was looking over our shoulder."  While the military judge replied that he "didn't see that," he did not inquire further into this matter.  In light of all the other trial developments, we conclude that the military judge's observations are insufficient to negate the other evidence of possible unlawful command influence.

Here, we share the military judge's judicial instinct in questioning the presence of the convening authority at the court-martial.  A court-martial is a public trial.[26]  There is no rule that the convening authority cannot attend a court-martial.[27]  But, as this case illustrates, the presence of the convening authority at a court-martial may raise issues.

---

[26] "The sixth amendment right to a public trial belongs to the defendant rather than the public; a separate first amendment right governs the interests of the public and the press in attending a trial."  5 Wayne R. LaFave et al., Criminal Procedure, § 24.1(a), at 450 (2d ed. 1999).

[27] Attendance by the convening authority at a court-martial is subject to the military judge's authority to close the court to the public or specific individuals.  See United States v. Short, 41 M.J. 42, 43 (C.M.A. 1994) ("The right to an open and public court-martial is not absolute, however, and a court-martial can be closed to the public or individuals can be excluded in the

Therefore, before attending a court-martial, a convening authority should give prudent and careful consideration as to the impact one's presence could have on both the proceedings and the perception of fairness of the court-martial. In this regard, we encourage a convening authority to initiate a dialogue with both the command staff judge advocate and the trial counsel before entering a courtroom. Discussing this matter with these lawyers would permit them to advise the convening authority of both general and case specific issues that may be raised by the convening authority's presence at the court-martial. It would also afford the trial counsel the opportunity to advise both the military judge and the trial defense counsel of the presence of the convening authority in advance, so that the matter can be discussed with the military judge and any issues litigated before the convening authority is present in court before the panel members.

The military judge and the lower court focused on the failure of the trial defense counsel to avail himself of the opportunity that the military judge gave to voir dire the panel. This view misapprehends the law regarding unlawful command influence.

Again, we reaffirm that the law of unlawful command influence establishes a low threshold for the defense to present

---

discretion of the military judge."); Rule for Courts-Martial (R.C.M.) 806(b).

"some evidence" of unlawful command influence.[28]  Long ago in United States v. Rosser,[29] we made clear that this Court will be vigilant in protecting a court-martial from improper influence by the convening authority.  In Rosser, we held that the military judge failed to make an appropriate "inquiry into the particular facts and circumstances" regarding the "eavesdrop[ping]" of a company commander and accuser in the case, on court-martial proceedings.[30]  We reversed the case because the military judge was "remiss in his affirmative responsibilities to avoid the appearance of evil in his courtroom and to foster public confidence in court-martial proceedings."[31]  Our holding in Rosser is rooted, in part, in our concern about the impact on a court-martial of the presence of the convening authority at trial.  In light of this precedent and the facts of this case, we hold the trial defense counsel here met the low threshold of presenting "some evidence" of unlawful command influence.

The military judge misevaluated the evidence that raised the issue of unlawful command influence.  In the case before us, we have "some evidence" which could constitute unlawful command influence.  The military judge then compounded the impact of

---

[28] Biagase, 50 M.J. at 150 (citations and quotation marks omitted).
[29] 6 M.J. 267, 269-73 (C.M.A. 1979).
[30] Id. at 270-73.
[31] Id. at 273.

this error by not calling upon the Government to rebut the existence of the command influence or to establish that it did not prejudice the proceedings.

Let there be no misunderstanding, we do not hold that the military judge was required to grant the defense motion for a mistrial based on the evidence before him at that time. Instead, as the "last sentinel" at trial to protect against unlawful command influence, the military judge had a duty to inquire further into this matter. As he did not and the evidence before him raised the issue of unlawful command influence, our attention is directed to the military judge's errors relating to failure to allocate properly the burden between the parties as required by Biagase. We now turn to the remedy we should employ to address this unresolved appearance of unlawful command influence.

### 3. The remedy

A military judge is empowered to protect against unlawful command influence. Also, the military judge has great discretion in fashioning a remedy.[32] But, as the military judge misapprehended the nature and degree of the potential unlawful command influence here, he did not call upon the Government to meet its burden nor did he take corrective action that might

---

[32] Gore, 60 M.J. 186-89; Rivers, 49 M.J. at 444.

18

have permitted the trial to proceed fairly.  Therefore, this Court must fashion a remedy for the error in this case.

Appellant seeks a dismissal with prejudice as a remedy. Responding to this claim for relief, we find guidance in our precedent stating:  "We have long held that dismissal is a drastic remedy and courts must look to see whether alternative remedies are available."[33]  We further reasoned that "dismissal of charges is permissible when necessary to avoid prejudice against the accused and the findings of fact of the military judge documented the prejudice to Appellant from the egregious error in this case . . . ."[34]  Applying this precedent here we consider several factors:  the nature of the error, alternative remedies, and possible prejudice to Appellant.

Initially, we focus on the nature and severity of the problem.  Here, we have unrebutted evidence raising the issue of unlawful command influence in the courtroom.  It is an undisputed fact that MAJ Loughlin, the officer who convened the court-martial, was present in his flight suit in the courtroom during closing arguments of counsel on findings.  This occurred after the Government had characterized Appellant's misconduct throughout the trial as a direct threat to the safety of the aviation community.  Also, the senior member was a member of MAJ Loughlin's squadron.  She therefore had an understanding of his

---

[33] Gore, 60 M.J. at 187.
[34] Id.

19

position and knew him.  Again, the failure of the military judge
to allocate the burden between the parties resulted in an
inadequate factual basis as to the exact nature and extent of
any unlawful command influence that might have been created with
regard to the senior member, or any other members of the court-
martial.

This situation invites us to consider possible methods to
obtain these facts.  We have embraced an evidentiary hearing in
United States v. DuBay[35] as a method to develop facts necessary
for appellate review.[36]  The so-called "DuBay hearing" has since
become a well-accepted procedural tool for addressing a wide
range of post-trial collateral issues.[37]  Such a hearing possibly
would afford the parties the opportunity to address both the
nature and the extent of the command influence, and its impact
on the proceedings.  But we reject this alternative remedy for
three reasons.

At an evidentiary hearing, the predicate facts that raise
the issue of unlawful command influence will not be in dispute.
This is so because the evidence of unlawful command influence
stems from the undisputed fact that MAJ Loughlin, the officer
who convened the court-martial, was present and in his flight

---

[35] 17 C.M.A. 147, 37 C.M.R. 411 (1967).
[36] Indeed, in DuBay, we remanded that case for a factfinding
hearing on post-trial claims of unlawful command influence.  17
C.M.A. at 148-49, 37 C.M.R. at 412-13.
[37] United States v. Fagan, 59 M.J. 238, 241 (C.A.A.F. 2004).

suit during closing arguments of counsel on findings. It is also undisputed that at least one of the court-martial members knew MAJ Loughlin well. Indeed, that member was the senior member of the panel and was a subordinate in the chain of command to MAJ Loughlin.

Therefore, the Government has two options: (1) show that these facts did not rise to the level of unlawful command influence; or (2) establish that the convening authority's presence had no prejudicial impact.[38]

We have stated that where the question of unlawful command influence involves court members, Military Rule of Evidence (M.R.E.) 606(b) limits the government's opportunity to establish that the unlawful command influence had no impact on the proceedings:

> This rule prohibits inquiry into two types of matters: (1) "any matter or statement occurring during the course of the deliberations," and (2) "the effect of anything upon [a] member's or any other member's mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member's mental process in connection therewith[.]"

> The rule has three exceptions to the first prohibition, one of which permits testimony about "any matter or statement" occurring during the deliberations when there is a "question whether . . . there was unlawful command influence." The exceptions, however, do not permit circumvention of the second prohibition (inquiry into the effect on a member).[39]

---

[38] Biagase, 50 M.J. at 151.
[39] Dugan, 58 M.J. at 259-60.

Therefore, in light of M.R.E. 606(b), there could only be an inquiry of the members regarding what, if anything, was said during deliberations about the commander's presence in the courtroom and their relationship with him. No one could question the members, however, as to the impact of the convening authority's presence in the courtroom "on any member's mind, emotions, or mental processes."[40]

In considering the option of such a narrowly focused DuBay hearing, we must bear in mind the present posture of this case, including the assertion of excessive post-trial delay presented in granted Issue II. We discuss this issue of post-trial delay in greater detail later in this opinion. It is sufficient at this point to note that Appellant's claim as to Issue II is meritorious and impacts the remedy we fashion to address the error relating to the alleged unlawful command influence.

We note that the panel's deliberation occurred almost seven years ago. Because of the serious nature of the error here involving the fundamental fairness of the court-martial and in light of the post-trial delay, a DuBay hearing is not appropriate. The extraordinary unexplained delay here is a significant factor in our declining to order a DuBay hearing.[41]

---

[40] Id. at 260.

[41] United States v. Wilson, 10 C.M.A. 398, 403, 27 C.M.R. 472, 477 (C.M.A. 1959) ("From the historic day at Runnymede, in 1215, when the English barons exacted the Magna Carta from King John, a guiding principle in English, and later American,

22

In this case, the appropriate remedy is to set aside the findings and sentence without prejudice thereby permitting a rehearing. This remedy is proportionate to three circumstances here: (1) the military judge failing to allocate properly the burden between the parties notwithstanding the defense having established "some evidence" of unlawful command influence; (2) the prosecution's failure to rebut the taint of unlawful command influence; and (3) the excessive and unreasonable post-trial delay.

B.  Issue II:  Denial of speedy appellate review

Appellant asserts that the 2,031 days for a first-level appellate review by a service court of criminal appeals was a constitutional due process violation. In Toohey v. United States,[42] this Court identified four factors in determining whether post-trial delay violates due process rights: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4)

---

jurisprudence has been that justice delayed is justice denied.").

[42] 60 M.J. 100 (C.A.A.F. 2004). In Toohey, this Court held that the appellant established a threshold showing of facially unreasonable delay, even without showing prejudice. Id. at 103. This Court remanded to the United States Navy-Marine Corps Court of Criminal Appeals for it to determine whether the lengthy delay violated the appellant's Fifth Amendment right to due process and whether the delay warranted some form of relief. Id. at 104.

prejudice to the appellant.[43]  More recently in <u>United States v. Moreno</u>,[44] this Court explained, "Once this due process analysis is triggered by a facially unreasonable delay, the four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation."[45] Consistent with this precedent, we evaluate these four factors.

### 1.  Length of the delay

Simply stated, the 2,031 days for a first-level appellate review by a service court of criminal appeals is facially unreasonable as it clearly is excessive and inordinate.[46]

### 2.  Reasons for the delay

This is not an unusually long and complex case.  Also, there is no reasonable explanation for why it took the convening authority over a year to take action on Appellant's case.  Next, we observe that it took 701 days for Appellant's case to be briefed by her assigned appellate defense counsel.  But we have noted in both <u>Diaz v. Judge Advocate General of the Navy</u>,[47] and

---

[43] <u>Id.</u> at 102 (deriving these factors from the Supreme Court's speedy trial analysis in <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972)).

[44] 63 M.J. 129 (C.A.A.F. 2006).

[45] <u>Id.</u> at 136.

[46] Here, 370 days passed before the convening authority acted. Another 195 days passed before the case was docketed at the lower court and a total of 2,031 days elapsed between sentencing and the initial decision of the lower court.  It took 555 days for the lower court to decide Appellant's case once the Government filed its brief in response to her brief.

[47] 59 M.J. 34, 38 (C.A.A.F. 2003).

Moreno,[48] it is the government that has the ultimate responsibility for the staffing and administrative management of the appellate review process for cases pending before the lower court. Moreover, the Government has failed to present any evidence that the Appellant benefited from the numerous delays requested by the appellate defense counsel. As in both Diaz and Moreno, we decline to hold Appellant responsible for the lack of "institutional vigilance" that should have been exercised in this case.[49]

Also, the Government took 210 days to file a responsive brief at the lower court. The Government has not presented any legitimate reasons[50] or exceptional circumstances for this lengthy period. The case had been fully briefed and submitted to the lower court for 555 days before the lower court issued its decision. Although this time period is lengthy, we "apply a more flexible review of this period, recognizing that it involves the exercise of the Court of Criminal Appeals' judicial decision-making authority."[51] Nonetheless, under these circumstances, we conclude that this second Barker factor also weighs heavily in favor of Appellant.

---

[48] 63 M.J. at 137.

[49] Id. (citing Diaz, 59 M.J. at 39-40).

[50] In repeated requests for enlargements at the lower court, the Government's justification included assertions that appellate Government counsel was "maintaining a significant case load," and referred to "the volume of criminal appellate work in the division."

[51] Id.

25

### 3. Assertion of the right to a timely review and appeal

At the lower court, Appellant belatedly asserted her right to a timely review on July 20, 2004. Her failure to object earlier is not a factor that weighs heavily against her.[52] Moreover, as the lower court decided her case within ten days of her belated demand, this factor weighs against Appellant, but not heavily.[53]

### 4. Prejudice

A final factor is any prejudice either personally to Appellant or to the presentation of her case that arises from the excessive post-trial delay.[54] Important to our analysis is our conclusion that Appellant's appeal is meritorious as to Issue I, alleging unlawful command influence. As Appellant's appeal is meritorious, she may have served oppressive incarceration during the appeal period. Appellant was sentenced to confinement for sixty days and she completed her confinement even before the convening authority acted. Therefore, in the unique facts of this case, the appellate delay here did not result in prolonged incarceration that may have been oppressive.

Moreover, we have stated that one facet of prejudice is where an appellant demonstrates "particularized anxiety or

---

[52] Id. at 138.

[53] See id. ("[T]he weight against [the appellant] is slight given that the primary responsibility for speedy processing rests with the Government and those to whom he could complain were the ones responsible for the delay.").

[54] Id. at 138-41.

concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision."[55] Appellant has not made such a showing here.

The final sub-factor focuses on whether there is any "negative impact on [her] ability to prepare and present [her] defense at the rehearing."[56] We have observed that "Due to the passage of time, witnesses may be unavailable [and] memories may have faded . . . ."[57] "In order to prevail on this factor an appellant must be able to specifically identify how he would be prejudiced at a rehearing due to the delay. Mere speculation is not enough."[58]

To satisfy this standard, Appellant asserts that a rehearing will be unfair or a DuBay hearing pointless. This generalized assertion of prejudice is insufficient to establish specific harm that she would encounter at a rehearing and she has not demonstrated prejudice.[59]

---

[55] Id. at 140.
[56] Id.
[57] Id.
[58] Id. at 140-41 (footnote omitted).
[59] We note that our recent Moreno opinion prudently leaves open the possibility in any later proceeding for Appellant to demonstrate prejudice arising from post-trial delay and states:

> We are mindful of the difficulty that an appellant and his appellate defense counsel may have at this juncture of the process in identifying problems that would hinder an appellant's ability to present a defense at rehearing. If an appellant does experience problems in preparing for trial due to the delay, a Sixth Amendment speedy-trial motion could appropriately be brought at the trial level.

27

### 5. Conclusion -- Barker Factors

In balancing the Barker factors, where an appellant has not shown prejudice under the fourth factor, "we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system."[60]  The unexplained and unreasonably lengthy delay in this case weighs heavily in Appellant's favor.  On balance, we conclude that Appellant was denied her due process right to speedy review and appeal notwithstanding her being unable to establish specific prejudice under the fourth factor.  We turn next to the relief appropriate for this constitutional violation.

### 6. Relief afforded to Appellant because of the due process violation for denying a speedy appellate review

As this due process error is one of constitutional magnitude, the burden shifts to the Government to "'show that this error was harmless beyond a reasonable doubt.'"[61]  We are mindful of the fact that Appellant has not demonstrated specific prejudice.  However, Appellant has been successful on a substantive issue of the appeal and a rehearing has been

---

Id. at 141 n.19.

[60] United States v. Toohey, 63 M.J. __ (20-21) (C.A.A.F. 2006).

[61] United States v. Brewer, 61 M.J. 425, 432 (C.A.A.F. 2005) (quoting United States v. Miller, 47 M.J. 352, 359-60 (C.A.A.F. 1997)).

authorized.  Also, we view the Barker factors weighing heavily in Appellant's favor.  In light of these circumstances, we cannot say that the Government has carried its heavy burden of establishing that this constitutional error arising from the post-trial delay is harmless beyond a reasonable doubt.  Moreover, as our balancing reflects, we view the delay in this instance to have been "so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system."[62]  As to relief from the due process violation arising from the excessive and unreasonable post-trial delay, we seek to fashion a remedy that will afford Appellant meaningful relief.  In Moreno we addressed the range of relief options available.[63]

---

[62] Toohey, 63 M.J. at __ (21).

[63] As we stated in Moreno:

> The nature of that relief will depend on the circumstances of the case, the relief requested, and may include, but is not limited to:  (a) day-for-day reduction in confinement or confinement credit; (b) reduction of forfeitures; (c) set aside of portions of an approved sentence including punitive discharges; (d) set aside the entire sentence, leaving a sentence of no punishment; (e) a limitation upon the sentence that may be approved by a convening authority following a rehearing; and (f) dismissal of the charges and specifications with or without prejudice.  Clearly this range of meaningful options to remedy the denial of speedy post-trial processing provides reviewing authorities and courts with the flexibility necessary to appropriately address these situations on a case-by-case basis.

63 M.J. at 143.

Initially, we note that we, in part, fashioned our relief as to the error arising from Issue I, authorizing a rehearing rather than a DuBay hearing to address the issue of unlawful command influence, because of the excessive post-trial delay in this case. Yet we conclude that further relief is warranted.

As Appellant has served the term of confinement, day-for-day credit for each day of unreasonable and unexplained post-trial delay would provide no meaningful effect. On the other hand, we also view dismissal with prejudice of the charges inappropriate under the circumstances of this case. Again, as in Moreno, we are obliged to fashion a remedy where we have authorized a rehearing and there is presently no direct sentence relief that we can provide Appellant. In this circumstance we will afford Appellant relief by limiting the sentence that may be approved by the convening authority should the rehearing result in a conviction and new sentence.[64]

### DECISION

The findings and sentence as approved by the convening authority and the decision of the United States Navy-Marine Corps Court of Criminal Appeals as to both findings and sentence are set aside without prejudice. A rehearing is authorized. In the event that a rehearing is held resulting in a conviction and

---

[64] See id. at 143-44.

a sentence, the convening authority may approve no portion of the sentence other than a punitive discharge.

CRAWFORD, Judge (dissenting):

Courts-martial are public trials, and there is no prohibition against the convening authority attending a portion of the trial. I disagree with the majority that the presence of the convening authority during closing arguments is some evidence of unlawful command influence when there is no evidence the members either saw or recognized the convening authority.

The military judge gave the trial defense counsel an opportunity to establish that the convening authority was seen or recognized by the members. A proffer of proof by the trial defense counsel that the senior member, Captain (CPT) Cisneros, was "intimately familiar" with the acting convening authority does not constitute such evidence. First, we do not know what that statement means. There was no indication during the voir dire, to include the individual voir dire, of any type of relationship between CPT Cisneros and the acting convening authority, Major (MAJ) Loughlin, other than she knew he was the executive officer of the squadron and she was a member of the same squadron. CPT Cisneros did not even know who the convening authority was until told at trial.

In a squadron or a battalion unit, many members of a panel will know, or be familiar with, the convening authority who is the squadron or battalion commander. During voir dire, the members testified under oath that they did not have any personal

prejudices or relationships to either side of the case which would have an impact on their deliberations. They also indicated there was nothing in their past education or experience that would have an impact on their deliberations. And to the catchall question, they testified that they were not aware of anything else not mentioned in the questions which would have an influence on their deliberations. CPT Cisneros, MAJ Vosper, CPT Williams, and Chief Warrant Officer (CWO) Bolter testified they knew the convening authority. They all stated unequivocally that they did not feel the convening authority would be displeased if there was an acquittal.

During individual voir dire, MAJ Vosper testified he was in the same squadron and flew with MAJ Loughlin, but he did not think that would have an impact or influence on him. CPT Cisneros knew the convening authority, MAJ Loughlin, as the executive officer of the headquarters squadron. Outside of the hearing of the members, it was clarified that MAJ Loughlin was the executive officer, but on the date of referral he was the acting convening authority. A number of the members knew counsel for both sides but indicated that would have no impact on their deliberations. The defense challenged CPT Cisneros and MAJ Vosper because they knew the convening authority. The trial counsel noted that because this was a small flight squadron, "Everyone is going to be affiliated with ATC or flights . . . ."

2

After hearing argument, the military judge denied the challenge for cause against CPT Cisneros and MAJ Vosper but granted challenges for cause against CPT Williams, CWO Bolter, and Master Sergeant (MSgt) Soucy. The defense then used their preemptory challenge against MAJ Vosper.

The evidence during voir dire does not establish that the senior member of the court was "intimately familiar" beyond the normal relationship that exists between officers in the same squadron or battalion. We have never held that a statement by an attorney constitutes evidence or an accepted proffer. In essence, the majority seems to convert the statement by the trial defense counsel to the status of unrebutted evidence.[1] United States v. Warner, 62 M.J. 115, 125 n. (C.A.A.F. 2005). To convert statements by counsel and a military judge to findings of fact is not only new, but also unprecedented.

This Court has guarded against unlawful command influence. See, e.g., United States v. Stirewalt, 60 M.J. 297, 300-01 (C.A.A.F. 2004); United States v. Gore, 60 M.J. 178, 179-89

---

[1] But see United States v. Gosselin, 62 M.J. 349, 353-56 (C.A.A.F. 2006) (Crawford, J., dissenting), where this Court noted that statement of counsel may not be used to determine providency even though such is allowed by the Supreme Court. In this case, the statement is used as evidence. What is the difference? In United States v. Turner, 39 M.J. 259, 266 (C.M.A. 1994), this Court held that a mere passing remark by defense counsel during his opening statement was not sufficient to open the door for additional evidence by the government, but here a mere passing statement constitutes evidence itself.

(C.A.A.F. 2004). Congress has done the same and has provided in Article 37(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 837(a) (2000) that a convening authority "may [not] censure, reprimand, or admonish the court or any member." This Court has now extended Article 37(a), UCMJ, far beyond its plain meaning, to include mere presence in the public courtroom to be the equivalent of a censure, reprimand, or admonishment.

The facts presented in this case do not support the existence of unlawful command influence nor did the defense counsel's offhanded comments amount to "some evidence" of unlawful command influence. "Some evidence" must be more than a mere allegation or speculation. See United States v. Dugan, 58 M.J. 253, 258 (C.A.A.F. 2003). I agree with the United States Navy-Marine Corps Court of Criminal Appeals that "trial defense counsel never stated he observed who or what the members might have been looking at." United States v. Harvey, 60 M.J. 611, 614 (N-M. Ct. Crim. App. 2004). "Rather, trial defense counsel made the assumption that the members were looking at MAJ Loughlin." Id. His assumption or suggestion that they were "focused on Major Loughlin is just that, a suggestion, assumption or speculation without deeper meaning and not supported by the record." Id. The trial defense counsel was not even aware of the presence of MAJ Loughlin in the courtroom until it was brought to his attention by the military judge.

How could the trial defense counsel say with any credibility who or what the members were looking at or could see in the courtroom?  Further, the military judge specifically stated he did not see the members "looking over [counsel's] shoulder."  The defense was also given the opportunity to conduct a further voir dire of the members and develop other facts that might establish unlawful command influence.  The failure to conduct additional voir dire of the members under oath and establish evidence in the record constitutes a waiver of the issue absent plain error.  Of additional note is the fact that the defense counsel did not raise the issue of the convening authority's involvement in his post-trial submission.  This constitutes waiver of this issue or at least is a good indication of the trial defense counsel's opinion of the merit of the issue.  United States v. Gudmundson, 57 M.J. 493, 495 (C.A.A.F. 2002) (holding that an accused waives the issue of a convening authority's disqualification if he knows of the issue and fails to object (citing United States v. Fisher, 45 M.J. 159, 163 (C.A.A.F. 1996)); United States v. Jeter, 35 M.J. 442, 447 (C.M.A. 1992) (holding that if an accused is aware of the convening authority's "personal interest" in a case and fails to object, the accused waives the issue); see United States v. Weasler, 43 M.J. 15, 19 (C.A.A.F. 1995) (concluding that an accused can initiate an affirmative and knowing waiver of

unlawful command influence to secure the benefits of a pretrial agreement).

Essentially, the majority's opinion allows trial defense counsel to create the appearance of "some evidence" by mere assertions on the record and create the appearance of an issue when in fact there is none. This opinion does not allow an accused to waive affirmatively an issue of unlawful command influence or preclude further inquiry once the issue is raised even if it is in his best interest not to pursue it. In fact, it also removes from the military judge the ability to determine if "some evidence" exists. Based on the majority's opinion, if the phrase or concept of unlawful command influence is raised in any shape, form, or fashion, the military judge should assume "some evidence" is raised and "allocate" the burden to the government to meet its burden in accordance with the tests set out in United States v. Biagase, 50 M.J. 143, 150-51 (C.A.A.F. 1999).

The majority's assertion that a United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), hearing would be fruitless because of the passage of time is pure speculation. Whether a DuBay is fruitless should not be based on speculation at this level but should await the DuBay hearing to determine the extent of the members' memories. Thus, at a minimum, I would order a DuBay hearing.

United States v. Harvey, No. 04-0801/MC

Because of the lack of "some evidence" of unlawful command influence and the failure of the defense to accept the military judge's invitation to conduct further voir dire, I respectfully dissent as to Issue I.

As to Issue II, until there has been a DuBay hearing to determine whether the convening authority's presence in the courtroom had an impact on the proceedings,[2] there has not been a showing of prejudice as to findings or sentence as required by the Barker[3] test.  The majority assumes unlawful command influence exists and thus, they also assume the prejudice prong of the Barker test has been met.

The defense has the burden to show "some evidence" which would "constitute unlawful command influence."[4]  In regard to a due process violation for excessive post-trial delay, the defense also has the burden to establish prejudice.[5]  The majority fails to hold the defense responsible for either burden.

The majority has started a troubling trend of finding a violation of an appellant's right to a speedy post-trial review

---

[2] Defense counsel may show at a DuBay hearing that the rules at their disposal at a retrial would not be beneficial.  See, e.g., United States v. Moreno, 63 M.J. 129, 149 (C.A.A.F. 2006) (Crawford, J., concurring in part and dissenting in part).
[3] Barker v. Wingo, 407 U.S. 514, 530 (1972).
[4] Biagase, 50 M.J. at 150 (citations and quotation marks omitted).
[5] United States v. Reed, 41 M.J. 449, 452 (C.A.A.F. 1995).

7

if they find any other meritorious substantive issues in a case without the benefit of a post-trial hearing as required by other courts.[6]  The majority is essentially saying that if there is a meritorious substantive issue, the prejudice prong of Barker is met without fully evaluating whether there is in fact actual prejudice.  This is not how that prong of the Barker test was intended to be applied.  Until the defense establishes that the convening authority's presence had an impact on the proceeding, there is no showing of actual prejudice as to the findings or sentence.

I do not concur in the majority's conclusion that Appellant's post-trial due process for speedy review has been violated.  If, in fact, there is prejudice as the majority asserts because of the passage of time and its effect on memories, why not dismiss the charges and their specifications?  Is there really a difference in the effect of the passage of time on the memories of court members for the purposes of a DuBay hearing versus the memories of witnesses[7] for a new trial?

---

[6] See, e.g., United States v. Alston, 412 A.2d 351, 362 (D.C. 1980) (trial judge did not find specific prejudice because of the defendant's ability to use evidence in its original form).
[7] Military Rules of Evidence provide for assistance in refreshing the recollection of witnesses' memory after a passage of time.

> If witnesses are not available, their former testimony
> can be introduced under the Military Rule of Evidence
> (M.R.E.) 804(b)(1) and M.R.E. 801(d)(1)(A) and (B) or
> M.R.E. 803(5).  Likewise, if memories fade, they can

I would affirm the findings and sentence in this case because the defense has failed to meet its burdens.

---

be refreshed under M.R.E. 612.  If there is a change in testimony, the parties have a right to impeach the witness.  M.R.E. 613.

Moreno, 63 M.J. at 149 (Crawford, J., concurring in part and dissenting in part).

United States v. Harvey, No. 04-0801/MC

BAKER, Judge (dissenting):

I do not believe Appellant has met his initial burden under United States v. Biagase, 50 M.J. 143, 150 (C.A.A.F. 1999), of showing "some evidence," which if true, would constitute unlawful command influence.  Therefore, I respectfully dissent.  However, while the case law does not require military judges to proactively intervene in the absence of some evidence of unlawful command influence, I believe they should as a matter of legal policy where, as in this case,  the unlawful command influence door is left ajar.  Accordingly, as a matter of legal policy, but not law, I agree with the disposition of this case.  Based on the facts of this case as well as the special responsibility military judges have with respect to allegations of unlawful command influence, I believe the military judge should have done more to inquire of the members notwithstanding trial defense counsel's decision not to do so himself.

I.  Application of Biagase

In Biagase this Court held that the test for raising unlawful command influence is "some evidence" of "facts, which if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential

to cause unfairness in the proceedings." Id. at 150 (citation and quotation marks omitted). The accused bears the burden of establishing some evidence of unlawful command influence. Id. If this burden is met, then the burden shifts to the government to show either that there was no unlawful command influence or that such influence will not affect the proceedings. Id. (citing United States v. Gerlich, 45 M.J. 309, 310 (C.A.A.F. 1996)).

The majority concludes that Appellant met his burden of initial persuasion based on three circumstances: the squadron's executive officer (XO), who was the original convening authority, entered the court-martial dressed in a flight suit and observed closing arguments, defense counsel suggested that the members were distracted by the XO's presence, and the military judge acknowledged that the squadron XO and a senior member of the panel knew one another. Indeed, the majority concludes that "the prosecution fail[ed] to rebut the taint of unlawful command influence" in this case. Thus, the military judge erred in not shifting the burden to the Government to rebut the evidence of unlawful command influence.

I am not persuaded that Appellant carried his initial burden of establishing some evidence, which if true, would amount to unlawful command influence. First, unless we

2

adopt a per se rule barring a convening authority from attending a court-martial, then the original convening authority's qua XO's presence in this case, without more, should not amount to unlawful command influence. There might be arguments for barring convening authorities generally, or in context, from attending courts-martial.

There are also arguments against adoption of a per se rule. First, the Rules for Courts-Martial (R.C.M.) themselves provide that courts-martial shall be open to the public. See R.C.M. 806(a) ("Except as otherwise provided in this rule, courts-martial shall be open to the public."). In addition, there may be circumstances where the convening authority might attend a court-martial or series of courts-martial to set a leadership example, show respect for the rule of law, or perhaps ensure that an accused receives a fair trial.

Second, the fact that the squadron XO of an aviation squadron at an air facility was wearing a flight suit, the customary uniform of the day on an air facility, is not remarkable, nor is it evidence of unlawful command influence. This is true, even in a case involving flight safety.

Third, the majority cites to the fact that Captain (CPT) Cisneros, the senior member of the panel, "knew" the

XO.  This is unremarkable.  She was a member of the XO's squadron, a fact identified and explored during voir dire, when trial defense counsel asked CPT Cisneros how she knew Major (MAJ) Loughlin, the convening authority.  CPT Cisneros responded, "He's the XO of H&HS, sir."  When trial defense counsel then asked CPT Cisneros whether there was "anything about [CPT Cisneros's] relationship with [MAJ Loughlin] that would cause [her] to lean towards the government or the defense side" in this case, CPT Cisneros stated, "No, sir."  The member was not challenged for cause.  So the real issue here is whether officers from the convening authority's squadron should have been serving on this court-martial.  But this is not Appellant's claim, and we have not previously precluded such panel membership on that ground alone.  Neither can we know whether Appellant might have thought it beneficial to have officers on his panel who were familiar with his reputation and performance in the squadron.

Two arguments made by the trial defense counsel also figure into the majority's analysis.  The trial defense counsel asked for a mistrial on the ground that it was "obvious during the whole closing argument that the panel was looking over our shoulder."  The military judge disagreed and stated that he "didn't see that."  The

4

military judge's words are ambiguous.  He might not have seen what trial defense counsel saw, or having seen what he saw, did not share trial defense counsel's evaluation. This might have been quickly resolved had trial defense counsel sought to obtain some evidence of unlawful command influence from the members themselves when offered the opportunity to voir dire the members.[1]

Further, the trial defense counsel stated that one of the members was "intimately familiar" with the convening authority qua XO.  However, this is not a fact, nor some evidence, but a turn of phrase now twisted by Appellant to infer possibilities already addressed and resolved during voir dire.  The member in question was familiar with the XO as she was an officer in his squadron.  And, as established during voir dire, this familiarity was professional and not personal.[2]  (The majority states that it gives this factor

---

[1]     MJ:  Do you desire to voir dire any of the members?

        DC:  No, sir.

[2]     Q:   How is it that you know the convening authority,
             which would be Major Loughlin?
        A:   He's the XO of H&HS, sir.

        Q:   And you're a member of that squadron?

        A:   Correct, sir.

little weight.  Based on the analysis above, I give it no weight.)

For the reasons stated, applying the Biagase framework to the facts of this case, I do not believe Appellant carried his burden at trial of identifying some evidence, which if true, would amount to unlawful command influence.

II.  Legal Policy and Unlawful Command Influence

However, the analysis should not stop here, for in this case there is tension between two propositions, one founded in case law and the other found in the same case law's descriptive dicta.  Even if Appellant did not establish "some evidence" of unlawful command influence, was the military judge nonetheless obliged to do something more as a general matter, or based on the particular circumstances of this case, as a so-called sentinel against unlawful command influence?  Here, I share the majority's conclusion that the primary issue is whether the military judge properly performed his sentinel duties based on the presence of the convening authority in the courtroom during closing arguments in Appellant's case.

---

Q:  Is there anything about your relationship with
him that would cause you to lean towards the
government or the defense side in this case?

A.  No, sir.

At the same time that Biagase established the framework for addressing unlawful command influence claims, it also reaffirmed that military judges "can intervene and protect a court-martial from the effects of unlawful command influence."  Biagase, 50 M.J. at 152; see also United States v. Rivers, 49 M.J. 434, 443 (C.A.A.F. 1998) ("In this case, the military judge performed his duty admirably.  His aggressive and comprehensive actions ensured that any effects of unlawful command influence were purged and that appellant's court-martial was untainted."); United States v. Stoneman, 57 M.J. 35, 42 (C.A.A.F. 2002) ("This Court has long recognized that, once unlawful command influence is raised, 'we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.'" (quoting United States v. Rosser, 6 M.J. 267, 271 (C.M.A. 1979))). This responsibility is distinct from the military judge's other responsibilities.  This responsibility emerges from the history, real and perceived, of unlawful command influence in the military justice system.  It goes to the core of the military justice system and its capacity to be fair and just.  It represents the crux of Congress's

7

purpose in establishing a Uniform Code of Military Justice, an independent civilian federal court to hear appeals based upon it, and subsequently in establishing an independent military judiciary.

When it comes to unlawful command influence, military judges are not mere bystanders at the courts-martial over which they preside. Although this Court has thus far declined to hold military judges independently responsible for identifying and remedying unlawful command influence, our decisions support the ability of military judges to do just that. See, e.g., Biagase, 50 M.J. at 152; Rivers, 49 M.J. at 443. Thus, as distinct from the military judge's responsibilities as evidentiary gatekeeper where, for example, the military judge is typically only required to act in response to counsels' arguments, military judges in the unlawful command influence context have a greater responsibility to intervene to ensure that the proceedings are fair and that the record is complete.

In this case, the military judge could have easily gone one step further in testing the facts. Were members in fact distracted, and perhaps influenced by the convening authority's presence? Or, was trial defense counsel incorrect in his observation that the members were looking over his shoulder during closing arguments? The only way

8

to resolve this uncertainty effectively was to ask the members themselves. The military judge could have taken it upon himself to make such inquiry, even after trial defense counsel declined the opportunity to do so. Although it is not clear from the record why trial defense counsel chose not to question the members himself, he may have had other tactical issues in mind, for example, not drawing the members' attention to the convening authority. Such tactical decisions may be made in other cases as well, strengthening the need for military judges to intervene where there is even the mere possibility of unlawful command influence. Had the military judge opted to inquire himself, any question regarding unlawful command influence might well have been resolved at the trial level.

III. Conclusion

Under this Court's case law, the defense bears the threshold burden of showing "some evidence" of unlawful command influence before the burden shifts to the government to rebut or negate the potential of such taint. Biagase, 50 M.J. at 150. Absent such a showing of some evidence, our case law has not assigned to the military judge an independent duty to investigate allegations of unlawful command influence. Therefore, I respectfully

9

dissent from the majority's application of Biagase to the facts of this case.

However, as a matter of legal policy, I agree with the disposition in this case. Military judges should have an independent responsibility to look beyond counsel's arguments and test the facts where the unlawful command influence door is left ajar and needs either to be opened to let in the light or firmly closed. In this case, the military judge could have, and should have, done more to determine whether the members were influenced by the presence of the original acting convening authority during closing arguments, notwithstanding trial defense counsel's decision not to voir dire the members.

In light of my conclusion that there was no legal error on Issue I, I agree with the majority's conclusion that Appellant has not demonstrated prejudice under Barker v. Wingo, 407 U.S. 514, 532 (1972). In any event, assuming Appellant was denied his due process right to timely review and appeal, that error was harmless beyond a reasonable doubt in this case. United States v. Allison, 63 M.J. 365 (C.A.A.F. 2006).